**George BERNSTEIN et al.,**
**Appellants,**

**v.**

**UNITED STATES of America,**
**Appellee.**

**No. 15463.**

United States Court of Appeals
Fifth Circuit.

May 31, 1956.

Claude Pepper, Lawrence G. Ropes, Jr., Arthur B. Cunningham, Philip T. Weinstein, Miami, Fla., for appellants.

James L. Guilmartin, U. S. Atty., Miami, Fla., for appellee.

Before RIVES, TUTTLE and JONES, Circuit Judges.

TUTTLE, Circuit Judge.

This is an appeal by five individual defendants from convictions for income tax law violations on all counts of seven different indictments. In one indictment the four defendants, Bernstein, Scherer, Hodesblatt (sometimes referred to as Hodes), and Hammerman, who were the sole officers, directors and equal stockholders of the Selray Corporation, were charged with a conspiracy together and with defendant Gersch, an employee, to violate § 145(b) of the Internal Revenue Code of 1939,[1] by causing to be filed false and fraudulent returns for the Selray Corporation for the years ending October 31, 1947 and 1948. One indictment charged Gersch in two counts with aiding and abetting the other four in a willful and knowing attempt to defeat and evade a large part of the taxes of the Selray Corporation for 1947 and 1948. One count charged the four defendants, other than Gersch, in three counts with willfully and knowingly attempting to defeat and evade a large part of the taxes of the Selray Corporation for the years 1947, 1948 and 1949. One indictment charged defendant Bernstein in three counts with willfully and knowingly attempting to defeat and evade a large part of the income tax due and owing by him for the years 1947, 1948 and 1949. In three other indictments each of the other three individuals Scherer, Hodesblatt and Hammerman was charged in three counts each with similarly willfully and knowingly attempting to defeat and evade a large part of his personal income taxes for the same three tax years.

By the indictments and bills of particular filed in response to orders of the court, the government charged that the four officers of the Selray Corporation planned to and did cause the true income derived from the operation of the Selray Corporation's Surfside Hotel, in Miami Beach, to be understated by having the defendant Gersch rewrite the daily records of the hotel during certain seasons of the years 1946–47 and 1947–48, and by another employee doing the same during the early part of 1949 by eliminating a substantial volume of room rentals from the records from which entries were made to the company's books, which were subsequently used as the basis for preparation of the company's income tax returns for the fiscal years in question. It was also charged that an amount of cash equalling the receipts thus omitted from the books of the company was accumulated by an employee of the hotel who delivered it to one of the defendants, and that substantially the same amount was paid over to the four stockholders as "dividends."

The government set out to prove its case by the aid of a Mrs. Jensen, formerly the "auditor" of the company who confessed to having played a part in the alleged fraudulent scheme although, according to her testimony, she refused for the first two years to do the job of "rewriting" the daily transcript.

The case was built up from certain books and records of the company which had been delivered by three of the defendants to the witness, Internal Revenue Special Agent Karo, when he commenced his investigation in 1951. He identified the journal, general ledger, duplicate guest bills and certain daily transcripts of room receipts.

The witness Jensen testified that in November, 1946, she was called into the office by defendant Hodesblatt who told her he was interested in doing something to see "if they could hold out some income to keep the tax down"; that he told her: "Think about it, and we will discuss it later"; that he later told her: "They were going ahead with the plan. They were going to import a man to rewrite the transcript." She further testified that at about the same time she had a conversation with defendant Scherer, who said "that he had a very good friend

1. "Any person who willfully attempts in any manner to evade or defeat any tax imposed by this chapter or the payment thereof, shall, in addition to other penalties provided by law, be guilty of a felony." 26 U.S.C. (1946 ed.) § 145(b).

that they were going to bring in to do this work who was fully qualified, and was a crackerjack at figures." She testified that later Scherer introduced her to Gersch and that Gersch had transcript sheets and arrival and departure records "and all the things that would be necessary for this particular work which is the same as is used at the front desk"; that "Mr. Gersch was the man to do the rewrite job, and that he would explain it to me and tell me how it was going to work." Finally Mrs. Jensen testified: "Mr. Gersch and I both spoke to Mr. Scherer and told him it was wrong to do this, and be sure he knew what he was doing, and Mr. Scherer this was [sic] what his partners wanted to do, and they would do it whether it was done here or whether they sent the records to New York to have the rewrite job done."

The witness then testified that beginning with December 9, 1946 and continuing until some time in April, the transcript sheets that were prepared by the room clerks were taken by Gersch and rewritten in a manner so as to drop off the receipts from a selected number of rooms, and that she then used the rewritten transcript sheets from which to make the postings to the journal and ledger, from which in turn the company's income tax was computed by outside accountants. Mrs. Jensen testified that the practice was again indulged in the winter season 1947–48 with Gersch as the active participant; further, that she herself, at the statement of Bernstein and Scherer in February, 1949, "that they would like to hold out approximately $25,-000 of 1949 income," dropped out items of room income at the bottom of the transcript. She did this, she said, until she accumulated $24,683.78. It is not contended by the government that Gersch had anything to do with the 1949 records.

This witness said that she removed from the actual receipts each day cash equal to the items omitted and accumulated this in envelopes that she kept until they were asked for by one of the defendants. The government introduced in evidence receipts signed by three of the defendants, Hodesblatt, Bernstein and Scherer on different occasions, which Mrs. Jensen said she took from them when she surrendered envelopes filled with cash to them. On the occasion of the first delivery, she said she was called into a room in which all four stockholders were seated at a table and there was a pile of cash in front of each of them.[2]

---

2. Since this testimony is critical as to the charges against the individuals, it is reported in some detail:

"Q. Mrs. Jensen, what, if anything, happened after you received this receipt, Government's Exhibit 47, in evidence, and handed the money to Mr. Hodes in your office? A. About ten minutes later Mr. Hodes called me and asked me if I would please come upstairs to his little office. I went upstairs and he said, "Mrs. Jensen, this cash isn't right."

"Q. At that time who were present in that little office you are talking about? A. Mr. Hodes,—all four of the gentlemen.

"Q. Name the gentlemen. A. Mr. Hodesblatt, Mr. Bernstein, Mr. Scherer, and Mr. Hammerman. Mr. Hodes was sitting at a little table on the side of the wall, and the three gentlemen were sitting in front of him.

"Q. Where was the table? A. The little table was opposite Mr. Hodes.

"Q. Where was the table with regard to the other three? A. In front of them; and Mr. Hodes had taken the money out and it was stacked up in piles around there, and he told me that the money was short what he had signed for.

"Q. Before you go into that part, would you tell the gentlemen of the jury where that money was stacked? A. That money was stacked in front of each one of them.

\* \* \* \* \*

"The Witness: Mr. Hodes told me that the money he had there did not add up to what he had signed for. I said, "It has to be here." And I fumbled around on the desk, and there was another envelope that had some $500.00 in it that he had not picked up and opened up, and counted it; and he said, "Thank you." And I turned around and walked downstairs and that was the end of it.

"Q. The little envelope that you found there, where did that come from? A. That had come from expenses.

"Q. Had you seen it before, that lit-

The government's witness Karo then testified that from the documents turned over to him by some of the defendants in 1951 he had taken the duplicate guest bills covering the period during which Mrs. Jensen had testified the daily receipts had been tampered with, and compared these daily duplicate guests bills with the rewritten daily transcripts, as prepared by defendant Gersch, and, after allowing some credits that were properly applicable in the case of some of the omitted receipts, he testified that during the months of December through April, 1946–47, $68,135.75 had been dropped out of guest receipts. In the same manner he testified that during the FY ended October 31, 1948, the sum of $35,542.56 had been dropped out, and during the following fiscal year $24,683.78 had been omitted.

Agent Karo testified to a computation in which, having figured the additional taxes that would be due from the corporation based on the inclusion of this omitted income, the corporation had available earnings for the respective years in question the following amounts: 1947—$60,346.70; 1948—$33,761.80; 1949—$17,384.83. He then testified to a computation showing the receipt by each of the four stockholder-defendants of one-fourth of each of these annual amounts. These computations showed additional unreported income of a total of $27,873.33 for each of the four defendants for the three years in question.

The defendants' attack on the judgment below is fourfold. These four grounds may be subdivided into two.

The first relates to sufficiency of the evidence and questions as to the correctness of the court's rulings on the admissibility of certain evidence. The second relates to charges by the court and counsel's opportunity to except thereto, and the court's general conduct of the trial.

■ Referring first to the sufficiency of the evidence, we think it quite clear from the foregoing statement of facts that there was ample evidence upon which the jury could find a willful intent on the part of the five defendants to set up a system by which the corporation's income would be greatly distorted as it appeared on the books of account, and that this was done with the intent to defraud the government of a substantial part of the taxes owed by the Selray Corporation. We think it equally clear that the evidence warranted a finding by the jury that the amounts allegedly withheld from the corporation as a result of the rewriting of the transcripts and segregation of receipts was equally divided among the stockholder-defendants.

What has just been said assumes the competence of the evidence admitted by the court and the correctness of the trial court's decision to the effect that the actual receipt by each of the four stockholders of a proportionate amount of the withheld funds amounted to a receipt by them of "dividends." This ruling, which resulted from several different actions by the trial court as to the admission of testimony by Karo and the rejection of exhibits tendered by the defendants and restriction on the cross-examination of Karo, was vigorously at-

tle envelope? A. I had that envelope and gave it to him. I don't know whether there were three or four envelopes. The envelopes only held so much, and if it would need more, I would make more.

"Q. Do you recall how much money was there at that time? A. It is on the receipt.

"Mr. Cunningham: I object. There is no indication that this is the same money.

"The Court: If you know, was that the same money that was in the envelopes?

"The Witness: Yes, sir.

"The Court: And this receipt discloses the amounts?

"The Witness: Yes, sir.

"(By Mr. Guilmartin):

"Q. Referring to Government's Exhibit 47,—

"The Court: It speaks for itself.

"Mr. Cunningham: Could that be exhibited to the jury?

"Mr. Guilmartin: If you don't mind, I will read it."

tacked during the trial and is made one of the principal complaints here.

■■ The sufficiency of Karo's evidence is attacked first on the ground that he reconstructed the actual room rent from duplicate bills without adequate evidence that the bills had in every instance actually been paid. The court correctly rejected this contention. First, because the duplicate bills were given to the special agents as records of the hotel company and may thus be considered as admissions against interest by it, and, since it was testified that the corporation was on an accrual basis, the creation of the account owing from the guests to hotel represented income on the day on which the charge was created, and any adjustment by reason of a failure to pay or any other ground would be taken on the books of the company as a deduction. There was no burden on the government to prove the correctness of such deductions by the corporation. Furthermore, it is clear that there was ample evidence that a very substantial part of these bills must have been paid in order to produce the amount of $117,000.00, which Mrs. Jensen testified had been held out of cash receipts. This was ample to satisfy the requirements as to prima facie proof.

■■■ The next contention by the defendants, to the effect that the government witness arbitrarily reconstructed receipts for certain months in the year without considering the duplicate bills for the rest of the year, cannot be seriously considered in the light of the testimony that the period selected for the reconstruction of the income by the special agent by reference to the duplicate bills coincides identically with the period during which Mrs. Jensen testified Gersch was employed for the first two years to falsify the records, and during which she herself, in the third year, did the same thing. In establishing its prima facie case against the individuals in the conspiracy indictment and in the charge of attempting to defeat and evade the cor-

poration's tax, it was not necessary for the government to do more than offer proof that the defendants knowingly and intentionally conspired to and did exclude items of gross receipts from the books, since from the books themselves, which are in evidence, it appears that the other entries reflecting the corporation's operations were made the basis of the preparation of the income tax returns. It was not necessary to attempt to prove whether additional amounts of room rentals were properly reflected in the other months of the year.

■■ The defendants strongly challenge the evidence by which the government seeks to prove that the amounts distributed to the defendants constituted "dividends." They contend that under the bill of particulars the government is bound by its specification classifying these amounts as "dividends." The defendants, however, lay entirely too much stress upon the technical requirements as to the declaration of dividends by a corporation. In their brief, and before the trial court, they made an effort to establish the proposition of law that any payments received from a corporation by its stockholders in order to constitute dividends must be declared out of earned surplus. The statute defines dividends as "any distribution made by a corporation to its shareholders * * * (1) out of the earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year." [3]

■■ The burden of the defendants' plea is that if the corporation had $117,-000.00 more earnings than it showed on its books, there would arise, as a liability, an additional tax on such amount, and, as we understand it, there would also arise liability in the way of a negligence penalty of 25%, together with interest at 6% on the principal amount of the tax, plus a fraud penalty of 50%, all of which liabilities should be deducted from the corporation's earned surplus in the respec-

3. 26 U.S.C.A. (1945 ed.) § 115(a).

tive fiscal years before any dividends could be declared or paid. Defendants complain of the court's refusal to let them attempt to show the amount of such penalties by additional cross-examination of the witness Karo, or by affirmative testimony and the introduction of a memorandum presented their counsel at a hearing in the office of the Regional Counsel of the Penal Division, who discussed amounts of alleged deficiencies and penalties in a conference with such counsel. No assessment of any additional taxes or negligence or fraud penalties or interest was ever made.

The special agent testified that in computing the availability of earned income for distribution as dividends, he considered the earned surplus of the corporation. We think it quite clear that he did not consider any fraud penalty or negligence penalty or interest resulting from the failure of the corporation correctly to pay and report its taxes. Obviously such computation had no part in ascertaining the financial position of the Selray Corporation as of the dates on which the jury found its officers received the unreported income. It would indeed be a strange rule that would require the accrual of fraud and delinquency penalties in determining the amount of earned surplus, for, of course, if the corporation carried out its legal responsibilities, no liability for such penalties would ever arise. As already stated, no such penalties have ever been assessed against the corporation, and in view of the results of the criminal proceedings, they may never be. It lies within the discretion of the Secretary of the Treasury to compromise the civil liabilities and, in the light of the result of the criminal proceedings, it is not at all certain what disposition would ultimately be made of any penalties that may be ascertained against the corporation. Moreover, it is not consistent with our ideas of proper accounting practice for officers and directors of a corporation to be permitted to conduct the affairs of their corporation in such a way as to defraud the government and then assert the existence of a fraud penalty as a corporate liability, and thus translate what would otherwise be a dividend distribution to themselves into a distribution of capital. If the Tax Court case of Stein v. Commissioner, 25 T.C. 940 holds to the contrary we are not disposed to follow it.

The government cites the case of Davis v. United States, 6 Cir., 226 F.2d 331, as supporting its contention that the legal ability of the corporation to declare dividends is immaterial in a case where corporate stockholders withdraw funds from a corporation and fail to report them. The appellants counter by showing that in the Poncet Davis case the government was not bound, as it was here, by a bill of particulars alleging that the payments made to the appellants were "dividends." We do not place our decision on this phase of the case on the authority of the Poncet Davis case. We put it on the ground that the corporation's earned surplus account was and should have been considered without reference to any future determination by the Commissioner of Internal Revenue that the corporation was subject to the delinquency or fraud penalties or the fact that it would owe interest on deficiencies in its normal tax.

Substantially all of the criticism leveled by appellants at the failure of proof of the payment of dividends is answered by this determination; so also is the criticism of the trial court's refusal to permit further cross-examination of the witness Karo, and examination in chief of defendants' witness Kantzler, and the court's rejecting defendants' proffered exhibits, which undertook to reconstruct the corporation's balance sheet by adding these items of fraud and delinquency penalties and interest. The court is not required to permit cross-examination of a witness in an effort to prove he did not include in his calculations an element which it would have been improper for him to include. Counsel was permitted to cross-examine Karo amply to prove that he did consider the company's earned surplus but that he did

not include the liabilities just discussed in his computations. Likewise, the court correctly rejected defendants' proffer of an exhibit that was comprised of calculations not based on any of the evidence before the court.

The third general ground of complaint by appellants is their contention that the trial court erred in three particulars in charging the jury and in "denying" appellants' counsel opportunity to except to charges as given out of hearing of the jury.

█ Touching on the last criticism first, we find no justification for the position taken by counsel. The court, in his charge, showed a lively sense of appreciation of its relation to the parties and their counsel, commenting specifically on its manner of conducting the trial and cautioning the jury not to be influenced by any apparent severity or agreeableness towards counsel.[4] We have carefully read the entire record, of course, including the charge, and we find no indication that the court would in any way have embarrassed counsel or their clients before the jury if counsel had made the simple request of an opportunity to make objections to the charge out of the presence of the jury. Counsel did not make such request. The court's failure to excuse the jury *sua sponte* to invite objections from counsel was not error. This was not a case in which the court declined to hear the exceptions out of the jury's presence. Thus, we do not think the case of Lovely v. United States, 4 Cir., 169 F.2d 386, applies. For all that appears, counsel had ample opportunity to make a request for his right to discuss the charges in a way that would not put him in a bad light with the jury. Moreover, it appears that the jury was twice instructed after first retiring and counsel had ample opportunity to make his objections while these matters were being discussed with the court. Cf. Schaffer v. United States, 5 Cir., 221 F.2d 17.

The most serious challenge to the judgment of conviction arises from the inclusion in the court's charge on intent of the following language:

"The law presumes that every man intends the legitimate consequences of his own acts,"

and

"A man is charged with knowledge of that which naturally and normally from all the evidence flows or results from his acts normally done or performed."

█ It is doubtless true, as we said in Dupree v. United States, 5 Cir., 218 F.2d 781, that, in the absence of a presumption created by statute, it is much the better practice for the trial court to charge a jury in a criminal case on permissible inferences that may be drawn from the evidence rather than charging in terms of presumptions. Nevertheless, we do not conceive it to be the law that every charge of a presumption other than that of innocence is reversible error in a criminal trial.[5]

---

4. The court included in its charge the following:

"A further instruction of the defendants. Gentlemen, we have elsewhere told you that you are the exclusive judges of the facts, and the Court is the exclusive judge of the law. In passing upon the facts, if you should have any idea or conception of what the Court believes about them, do not be influenced thereby. Moreover, do not try the lawyers in the case. The Court has at times during the trial endeavored to prod counsel and get them to go forward. They may not have been successful in doing so. Do not charge the defendants or the Government with their conduct in this respect.

And if the Court has seemed to be severe in any instance, do not let that influence you as against or in favor of the parties. If the Court has seemingly been polite or agreeable to any witness or any person in the trial, these matters will not be noticed by you. Try the defendants upon the evidence submitted, and the evidence from the witness stand only."

5. In this connection see Pollock v. United States, 5 Cir., 202 F.2d 281, 285, where this court, in a footnote, seems to have approved a charge that stated, in a net worth prosecution, "The increase, if any, in net worth is presumed to be net income if certain conditions obtain."

Inasmuch as we have concluded that this language in the charge of the trial court here was not reversible error, we reproduce the unusually full and complete charge of the court on intent in the footnote.[6]

6. "The question of intent is a matter for you, as jurors, to determine, and, as intent is a state of mind, and it is not possible to look into a man's mind to see what went on, the only way you have of arriving at the intent of the defendants or defendant in this case, and you must consider each defendant separately as respects to each charge made, and each count in each indictment, is for you to take into consideration all of the facts and circumstances shown by the evidence, including the Exhibits, and determine from all such facts and circumstances what the intent of the defendant was at the time in question.

"The Government contends that there was 'an attempt to evade' by the defendants, and that such attempt was wilful on their part.

"The defendants contend that they never 'attempted to evade' any of their taxes, and that there was no wilfulness on their part.

"The requirement that an 'attempt to evade', the 'wilful', means that you must pass to some extent upon the mental state of the defendants at the time the 'attempts' to evade occurred. 'Wilfulness' is largely a matter of 'intention.' There must be a wrongful intent in the defendants' minds before they can be found guilty of wilfully attempting to evade their taxes.

"Before any attempt to evade taxes can be wilful, it is, of course, necessary that the person or persons making the attempt have some actual knowledge of his tax obligation, and that such obligation exceeded the amount reported by him. Otherwise there could be nothing which he could 'intend' to evade. Having such knowledge, he can then wrongfully intend to evade his tax obligation or part of it.

"Wilfully, as used in connection with this offense, means knowingly and with bad heart and with a bad intent. It means having the purpose to cheat or defraud or to do a wrong in connection with a tax matter. It is not enough if all that is shown is that the defendant was stubborn or stupid, careless, negligent, or grossly negligent. A defendant is not wilfully evading a tax if all that is shown is that he is careless about keeping his books. He is not wilfully evading a tax if all that is shown is that he made errors of law. He is not wilfully evading the tax if all that is shown is that he in good faith acted contrary to the regulations laid down by the Bureau of Internal Revenue of the United States Department of the Treasury. He is not wilfully evading a tax if all that is shown is that he failed to hire competent bookkeepers or accountants.

"The wilfulness necessary may best be described as the state of mind of the taxpayer wherein he is fully aware of the existence of a Tax obligation to the Government which he seeks to conceal. The wilful evasion of a Tax requires an intentional act or omission as compared to an accidental or inadvertent one. It also requires a specific wrongful intent to conceal an obligation known to exist as compared to a genuine misunderstanding of what the law required, or a bona-fide belief that all receipts had been reported by one's employees. Therefore, if you have a reasonable doubt after a consideration of all the evidence, that the defendants and each of them believed that all of his receipts had been reported in the books of the Selray Corporation by his bookkeeper or accountant, then you should return a verdict of not guilty.

"Now the mere fact that a taxpayer knew he had income which he did not report and did not pay tax on, even though he knew a tax was due, is not itself alone sufficient to constitute a violation of the law here involved. There must be a wilful and positive commission of an act or acts in the attempt to evade taxes.

"In explanation of that last charge, if somebody had something in mind, that wouldn't be enough. You would have to go forward and do something about it.

"The defendants in this case cannot be found guilty simply because they may have failed to include in their Income Tax Returns items of income or sources of income that should have been included. They can only be found guilty in the event that they wilfully and knowingly undertook to evade the Tax as charged in the indictment.

"Now intent may be ascertained from all the facts in evidence and the inferences that reasonable men might naturally draw from the evidence. The law presumes that every man intends the legitimate consequences of his own acts, and a man is charged with knowledge of that which naturally and normally from all the evidence flows or results from his acts normally done or performed. There must be a union or joint operation of act and in-

It would, of course, be reversible error for a trial court to charge that if the jury found that the accused caused the daily transcript to be rewritten, there was a presumption that they intended to defeat and evade the corporation's income tax. This is substantially what the trial court did in Morissette v. United States, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288. There the trial court charged:

" 'And I instruct you to this effect: That if this young man took this property (and he says he did), without any permission (he says he did), that was on the property of the United States Government (he says it was), that it was of the value of one cent or more (and evidently it was), that he is guilty of the offense charged here. If you believe the government, he is guilty * * * The question of intent is whether or not he intended to take the property. He says he did. Therefore, if you believe either side, he is guilty.' Petitioner's counsel contended, 'But the taking must have been with a felonious intent.' The court rules however: 'That is presumed by his own act.' " 342 U.S. 246, at page 249, 72 S.Ct. at page 243.

Here the government undertook to show that the accused caused transcripts of daily receipts to be rewritten; thereafter that the written transcripts were used as the basis of the entries in the books of account. There was no proof that instructions were given that the omissions from daily receipts were to be translated into the income tax returns. It seems clear that the ·language here complained of was directed to connecting the alleged instructions to the employes to drop out the receipts to the natural result of this step, i. e., that the same omission would show up in the books of account and the income tax returns. We think this is apparent from the inclusion of the word "legitimate" in the challenged charge. This is not the same as saying that the law presumes that every man intends the consequences of his own acts, even though an illegal consequence occurs. As we have indicated, it would have been more in accord with recognized principles for the court to have said in effect "If you believe that the defendants instructed Gersch or Mrs. Jensen to omit room rentals from the daily transcripts, you may infer from that that they knew and intended that the figures, thus rewritten, would be reflected in the books of account and in the income tax returns of the corporation." Since, however, the court had already charged the jury that even a knowing omission of taxes they knew to be due was not sufficient to supply the ingredient of willful intent, this keeps the challenged charge from having anything like the vice of the charge struck down in the Morissette case. In view of the lengthy explanation of the elements of willfulness and intent, it is clear that the defendants could not have been prejudiced by the language complained of. Nothing in Wardlaw v. United States, 5 Cir., 203 F.2d 884, 887, is in conflict with what we decide here, because there the court did not use the word "legitimately," and further added the specific statement " 'the natural presumption would be if a person consciously, knowingly, or intentionally did not set up his income and thereby the government was cheated or defrauded of taxes, that he intended to defeat the tax.' " Thus, the only inquiry left for the jury in the Wardlaw case was whether the taxpayer knowingly failed to report the correct tax. He admitted that he had done so, but sought to explain his failure on an honest misconception of law. The charge deprived him of this defense.

Nor do we find any conflict with the decision of this court in Hargrove v. United States, 5 Cir., 67 F.2d 820, 90

tent. It is not possible to look into the mind of man and see what its workings are, or to bring a photograph of the mind of a man and exhibit it to the jury, so as to determine clearly and absclutely what the workings of a human being's mind are, and from necessity, intent with which an act is done is to be drawn or determined from all the surrounding circumstances."

A.L.R. 1276. There the trial court specifically charged that if the accused intended to do the act (failing to file a return where one was due) then this intent supplied the element of willfulness under the statute. Such a charge was clearly erroneous because it failed to take into account the distinction between offenses which are *mala prohibita* and those in which a specific willful intent must be shown. Here the charge that the jury must find a specific willful intent in order to convict was full and complete.

So, too, does the instruction here differ from that in Barfield v. United States, 5 Cir., 229 F.2d 936. There, in a prosecution for transportation of a stolen automobile interstate, knowing it to have been stolen, the court charged:

> "Proof that a defendant was in possession of property (the accused admitted he was driving the automobile) recently stolen raises a presumption of guilty knowledge."

This court coupled this charge with a failure to define possession as constituting prejudicial error, because a type of possession (driving the car) was admitted, and the fact that the vehicle had been recently stolen was undisputed. The charge thus practically amounted to an instruction that on the facts the accused was presumed to be guilty, because the element of knowledge was the only unproved element of the offense.

■ We conclude that the proper rule is stated in Imholte v. United States, 8 Cir., 226 F.2d 585; Banks v. United States, 8 Cir., 223 F.2d 884; and Bateman v. United States, 9 Cir., 212 F.2d 61. Where, as here, the entire charge on intent clearly gives the jury the correct legal standard to apply, the use of the challenged phrase on presumption does not constitute reversible error.

■ The second challenge to the court's charge which appellants press here is its definition of reasonable doubt. The court gave a charge on reasonable doubt as requested by the appellants.[7] This was given as a part of what the court denominated "the defendants' instructions," a description of dubious value when all of the charge is supposed to represent what the court considers as the law applicable to the case. The court later gave a further charge "of my own choosing" on reasonable doubt.[8] This

---

7. "Further on the defendants' instructions. From the beginning of the trial until the end, the Government has the burden of establishing beyond a reasonable doubt, every fact essential to the conviction of the defendants. The defendants have no burden to sustain. It is enough that their evidence taken with the Government's, raises a reasonable doubt as to their guilt, and if it does so raise a reasonable doubt, in that case they must be acquitted of whatever particular Indictment or count you are considering in respect to any of the Defendants. The Defendants, as the Court has charged you, are presumed to be innocent, and this presumption continues throughout the trial and during the deliberations of the jury, and is overcome when and only when their guilt is established beyond a reasonable doubt.

"The term 'reasonable doubt' means just what the term implies. By 'reasonable doubt' I do not mean to be understood as stating that the defendants must be found guilty beyond all doubt whatsoever, but beyond a doubt founded in reason and arising from the evidence. 'Reasonable doubt' means such a doubt as will leave in the jurors' mind, after a candid and impartial consideration of all the evidence, so undecided that he is unable to say that he has an abiding conviction or assurance of the defendants' guilt. It is not a vague, possible or speculative doubt, but such a reasonable doubt as remains in the minds of reasonable jurors after a careful consideration of all the testimony.

"I will give you further instructions on reasonable doubt of my own choosing later on."

8. "Now as to reasonable doubt. By reasonable doubt is not meant a speculative or suppositious doubt. It simply means what the expression implies, and that is a doubt for which a reasonable man can give a reason. If after you have carefully considered and weighed all of the evidence in the light of the law which the Court now gives you, you have a full, firm and abiding conviction to a moral certainty that the defendant is guilty as

charge included the challenged statement "It simply means what the expression implies, and that is a doubt for which a reasonable man can give a reason."

It is very difficult to see how, in the light of the entire charge of the court, this attempt to define reasonable doubt could really be harmful to appellants. The use of this language was discussed in Schaffer v. United States, 5 Cir., 221 F.2d 17, when a similar challenge was made to the use of this definition. We will adhere, however, to the course of action taken by the Supreme Court in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 138, 99 L.Ed. 150, where the trial court had charged that reasonable doubt was "the kind of doubt * * * which you folks in the more serious and important affairs of your own lives might be willing to act upon." The court criticized this definition as tending to create confusion rather than misapprehension and quoted a statement from Miles v. United States, 103 U.S. 304, 312, 26 L.Ed. 481: "Attempts to explain the term 'reasonable doubt' do not usually result in making it any clearer to the minds of the jury." The court then said that in spite of this "confusing" charge, which seems to us to be at least as inappropriate as the one here complained of, "we feel that, taken as a whole, the instructions correctly conveyed the concept of reasonable doubt to the jury." So, here we do not feel that this charge, if error, was prejudicial.

■■■■■ The third complaint as to the court's charge arises from the manner in which the court outlined the prosecution's contentions. In several places, where the court referred to withholding of money, receiving of dividends, or misdeeds taking place, it did not immediately qualify such statements by saying that these things were charged by the government. We have carefully considered each of these challenged references and are satis-

fied that it was abundantly clear that the jury was fully apprised that these were merely matters alleged by the government and were not matters stated by the court to be true. There was no error here.

■■■■■ We turn finally to the contention that the trial court unduly restricted appellants' counsel in his cross-examination and that he commented on the evidence and questioned the witnesses in a prejudicial manner. It appears that the trial judge kept a strict rein on counsel; it is also apparent that the court frequently caught the significance of the testimony of witnesses before counsel thought they had fully developed the matter for the benefit of the jury. On some of such occasions the court paraphrased or reworded the testimony and then asked the witness as to the correctness of his understanding. At times also the court sought to make clear to the jury the theory of the prosecution's case. Upon a careful reading of the record it is apparent that counsel for both government and appellants received abrupt though not severe treatment at the hands of the court. However, it is amply clear that the court sought at all times to provide the accused the opportunity to develop the full case which the court felt was legally available to them. It was principally his strict adherence to the applicable theory of prosecution and defense that seems to have caused counsel's feeling of frustration and severity of treatment. The court was at no time discourteous or thoughtless in his rulings. Nothing appears in the record to indicate that the judge did or said anything that prejudiced appellants or their counsel with the jury. As to his attitude towards counsel and as to his desire to protect against any possible adverse impressions resulting therefrom the trial court gave a specific charge, supra, footnote 4, which would certainly be calculated to leave all parties and the jury with a feeling that

charged in the Indictment or any count thereof, then his guilt has been established beyond a reasonable doubt. If you do not have such a full, firm and abiding conviction, then his guilt has not been

established beyond a reasonable doubt. The law does not require a person to be proven guilty beyond a mathematical certainty, but only to a moral certainty."

the case was to be decided strictly on the sworn testimony, and that all else, other than the judge's charge, was unimportant in their deliberations. As to the court's efforts to keep the precise issues before the jury, we think the language of the Supreme Court in Holland v. United States, 348 U.S. 121, 75 S.Ct. 127, 99 L. Ed. 150, is reasonably applicable to any income tax prosecution to the effect that in cases of this complexity, the court must at all times make the issues clear to the jury and explain inferences that can be drawn both for and against the accused.

There being no reversible error, the judgment is

Affirmed.