**R. I. McCLANAHAN, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 15515.**

United States Court of Appeals Fifth Circuit.

March 16, 1956.

Rehearing Denied April 16, 1956.

David Bland, Joseph W. Cash, Houston, Tex., for appellant.

Malcolm R. Wilkey, U. S. Atty., John C. Snodgrass, Asst. U. S. Atty., C. Anthony Friloux, Jr., Asst. U. S. Atty., Houston, Tex., for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

JONES, Circuit Judge.

The appellant, R. I. McClanahan, was an electrical inspector employed by the City of Houston, Texas. He made the acquaintance of C. L. Fitzhenry, a real estate broker and building contractor. Appellant provided funds for the purchase of dwellings from veterans who had rights to home loan guaranties by the Veterans Administration. These veterans, all of whom were without any intention of occupying the property acquired and simultaneously sold by them, were located by Benjamin Skinner. Skinner was brought into the picture by Fitzhenry. Skinner received $50 for each veteran he procured. The veteran, brought to Fitzhenry, would fill out the forms for procuring an insured V. A. Loan and a contract for the purchase of a specific property. The receipt of a down payment was acknowledged, but was not made by the veteran. The property, the subject matter of the transaction, was never seen by the veteran. In completing the loan application form, each of the veterans was required to state as the purpose of the loan that he was acquiring a home. Each veteran and his wife were required to make an affidavit that they would occupy the property as their homestead. None of the six veterans in the transactions involved in this appeal saw the property and none of them had any real intention of occupying it. Upon the transfer of title to the veteran and the closing of the loan he would convey the property to the appellant, receive between four and five hundred dollars, and go his way. When the title to a dwelling was in appellant's name he provided the funds with which to pay the veteran. Fitzhenry then found purchasers for the equity above the V. A. guaranteed loan at prices at or in excess of a thousand dollars. Appellant was reimbursed for his outlay in the venture, and the remainder was divided between Fitzhenry and appellant.

Fitzhenry and appellant were charged in a thirty-one count indictment. Also named in the indictment as a defendant was Charles H. Baldridge, as to whom the indictment was dismissed on motion of the United States Attorney. The first thirty counts related to ten separate transactions, each of which formed the basis of three counts of the indictment. Of these groups the first count charged that the defendants "did knowingly and wilfully cause to be made a false, fictitious and fraudulent statement and representation" in inducing a named veteran to make the false statement in the loan application. 18 U.S.C.A. § 1001, § 2. The second of each group of three counts charged that McClanahan and Fitzhenry "did knowingly and wilfully, by a scheme, trick and device, conceal and cover up and caused to be concealed and covered up a material fact" that the named veteran did not intend to occupy the premises as described as his home. 18 U.S.C.A. § 1001. The third of the

series of counts charged that Fitzhenry and McClanahan "did knowingly and wilfully cause to be made a false, fictitious and fraudulent statement and representation" in causing the veteran and his wife to make the affidavit of intent to occupy the property as a homestead. 18 U.S.C.A. § 1001, § 2. Each of the counts recites that had the Veterans Administration known that the veteran did not intend to occupy the premises as a home the V. A. loan guaranty would not have been issued. The thirty-first count charged the appellant, Fitzhenry, and Baldridge with conspiracy to do what the prior counts charged had been done and set forth thirty-three alleged overt acts. 18 U.S.C.A. § 371. Fitzhenry was convicted on all counts. The appellant, R. I. McClanahan, was found guilty on the substantive counts involving six transactions, eighteen counts, and on the conspiracy count. He was given a suspended sentence of twenty-seven months and a fine of $1,500.00. A motion of the appellant for a new trial and in arrest of judgment was denied. Before us the appellant urges that the only evidence that tied him to any illegal transactions was the "unsupported, contradictory, vague, equivocal and sometimes incredible" testimony of Skinner, an acknowledged accomplice of Fitzhenry; that the charges to the jury were erroneous, particularly with respect to criminal intent; that Government counsel made prejudicial insinuations of undisclosed knowledge of facts adverse to appellant; and that the jury argument of Government counsel was improper.

■ The court properly charged that Skinner and the veterans would be, in effect, if not principals, accomplices whose testimony should be received with caution and scrutinized with care. It was Skinner's testimony that his initial contact with Fitzhenry was in the fall or early spring of 1950 or 1951 when he inquired if he could buy another home with a V. A. loan guaranty, he having already exercised his privilege of purchasing a dwelling with a V. A. guaranty.

He quoted Fitzhenry as saying it would be all right if he were to get a veteran to buy the house for him and buy the house from the veteran. Skinner found a veteran, Joel W. Jackson, and a house was purchased which had been built by McClanahan under the supervision of Fitzhenry but with title in the developer, Oak Meadows Corporation. Fitzhenry then proposed to Skinner, so Skinner testified, that each of them would put up part of the necessary funds and they would get veterans to use their V. A. loan guaranty rights in acquiring residential properties and split the profits, but instead he went to work for Fitzhenry securing veterans for a flat rate of fifty dollars. Skinner told of an occasion when he, Fitzhenry and the appellant were together discussing the availability of veterans, where they were most available and where they, the three of them, could get them the easiest. Skinner quoted appellant as telling him that he, Skinner, had better luck at Sinclair Rubber (among whose employees most of the veterans secured by Skinner were found), than appellant had with those contacted by him because, appellant is quoted as saying, the men that worked uptown were wiser than the guys that worked at Sinclair. Skinner testified regarding a transaction where the veteran was K. P. Bradshaw who wanted cash. McClanahan provided Skinner, so Skinner said, with a cashier's check for $400.00 payable to Skinner which he cashed. On two occasions, Skinner related, the appellant gave him a personal check or cash with which to pay the veteran. The testimony was plausible and there is no reason for rejecting or disregarding it.

■■ A conviction may rest upon the uncorroborated testimony of an accomplice. Todorow v. United States, 9 Cir., 1949, 173 F.2d 439. The conviction here is not wholly dependent upon Skinner's testimony. The appellant took the stand. His testimony was in some respects equivocal and in others contradictory. In telling of the deal with Jackson the

appellant stated that he didn't know Jackson but he then (at the trial) understood that Skinner was the eventual or first owner of the house. He went on to say, "I have never known or met or heard of Mr. Skinner". He later testified:

"Well, I had seen Mr. Skinner around this addition and see him talking to Fitzhenry, and everywhere I saw Skinner every time I saw him talking to anybody he always had some kind of a deal, he was always promoting something, trying to sell a house or do this or do that. I mean, he mentioned several times he had these various houses or so forth lined up, I mean, at first I wasn't interested in it because Mr. Fitzhenry and I had planned to go ahead with this building.

"But at some time in there, well, he did come up with one and he talked to Fitzhenry about it or talked to me about it and if he talked to me I sent it back to Fitzhenry or told him to talk to Fitzhenry because I wasn't interested. Actually at that time I didn't want to fool with houses. I didn't know anything about the value of houses and property and so forth."

On cross-examination he was asked if Government counsel had misunderstood him to say that he had never known, met or heard of Mr. Skinner until the indictment. He responded "You did misunderstand me. I said I never knew or heard of Mr. Skinner until he came to us with these houses and so forth". It was established that each of the veterans involved in the substantive counts conveyed to the appellant. Without further extending our review of the facts, we deem it enough to say that the evidence shows that the appellant, with Fitzhenry, and through Fitzhenry and Skinner, knowingly and wilfully caused the false statements and representations to be made in the applications and affidavits involved in the six transactions from which stem the convictions on the substantive counts, and knowingly and wilfully, by trick, scheme and device caused to be concealed and covered up the material fact that the veterans did not intend to occupy the property ostensibly purchased by them.

The appellant takes up, one by one, the overt acts listed in the conspiracy count of the indictment, and argues that no one of them is sufficient to support a conviction of the conspiracy charge. The evidence cannot be divided into small segments and each particle weighed separately. All must go into the scales together. The appellant stresses the fact that Skinner was unable to testify that there was an arrangement between Fitzhenry and the appellant. "The existence of the agreement or joint assent of the minds need not be proved directly, but may be inferred by the jury from other facts proved." 11 Am.Jur. 570, Conspiracy, § 38. The contention that the evidence is not sufficient to sustain the conspiracy conviction is not well founded.

While on the stand the appellant testified with respect to the advice that he had received from his attorney, Joe Jarrard, whom he met before he commenced buying properties from veterans. He testified:

"I went to Mr. Jarrard's office to seek legal advice because he was a lawyer, and I knew as everyone else knew it was common practice for the veterans to sell houses which they then owned. I asked Mr. Jarrard if there was any legal technicality or anything that might come up later with respect to or with reference to buying property which had originally been bought by a GI and which was insured by what we referred to as a GI loan, and he told me that there was not."

Appellant said he relied upon this advice. He explained:

"Before any transactions were made, before he drew any papers for me at all, I mean, I asked him this question: if there was any technicality in this and he assured me

there was not, so it was on his legal advice that I bought this property."

He denied any understanding that veterans were to be induced to make false statements to get title to houses, saying:

"There was no such understanding, and it was not done. We didn't induce anybody to buy houses. Any house that I bought, as far as I know the veteran had title to it. Why he got title to it, I don't know and, frankly, after I asked Jarrard if it was legal for me to buy the property I wasn't concerned with why the veteran had title to it. In other words, it was my understanding then, and it is still my understanding, if a person has legal title to property then it is theirs to do what they want to with it."

He further said:

"Before any deed was drawn into me I specifically asked if there was any technicalities involved in this and I got his specfic answer of no."

■■ The appellant requested an instruction on the consideration to be given to the matter of reliance upon legal advice. The substance of the requested instruction was that if such advice was followed, even though it was erroneous, the acts would not be wilful if done in reliance on the advice received. The appellant asked that "wilful" as used in the indictment be defined as meaning with bad purpose. A charge that for an act to be wilful it must be done with evil intent or bad purpose is not here applicable. Corcoran v. United States, 5 Cir., 1956, 229 F.2d 295. The jury were instructed that "The word 'wilful' means no more than an interdicted act, that is, a forbidden act that is done deliberately and with knowledge." This language had our approval in' McBride v. United States, 5 Cir., 1955, 225 F.2d 249, certiorari denied 350 U.S. 934, 76 S.Ct. 306, 100 L.Ed. ——. The advice of counsel would not justify the appellant in the wrongdoing condemned by the statutes under which he was indicted and convicted. The appellant relies upon Har-

grove v. United States, 5 Cir., 1933, 67 F.2d 820, 90 A.L.R. 1276. This case was distinguished in the opinion in McBride v. United States, supra, and for like reasons is to be distinguished here.

■ The appellant requested an instruction which would have told the jury, in effect, that without proof beyond a reasonable doubt that appellant knew false statements were being made by the veterans there could be no conviction. As in Russell v. United States, 5 Cir., 1955, 222 F.2d 197, 199, and as in Corcoran v. United States, supra, there is evidence that the appellant "was in on the commission of the offense from its inception and after its conclusion." The court incorporated in its jury instructions the statutory provision as to aiding and abetting. That which was said by this court in Russell v. United States, supra, is applicable here. From that opinion we quote:

"Under the federal statute, 18 U.S.C.A. § 2, an accessory before the fact becomes a principal; an aider and abettor may be indicted, tried and convicted as a principal. [Citing cases.] There must exist a community of unlawful intent between the accessory and the perpetrator of the crime, but '* * * an accessory is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him', [Citing authorities.] It is not essential that the accessory know the modus operandi of the principal. Keliher v. United States, 1 Cir., 193 F. 8, 17. In each of the cases of Todorow v. United States, 9 Cir., 173 F.2d 439, 443, and Turner v. United States, 9 Cir., 202 F.2d 523, the evidence was held sufficient to show that the defendant caused the false statements there involved to be made to the Veterans Administration." Russell v. United States, 5 Cir., 222 F.2d 197, 198–199.

The refusal to give the requested instruction was proper.

During the trial the appellant was being cross-examined about the part he played in one of the transactions. In responding to an objection for relevancy, the Government attorney commented:

"If your Honor please, the reason that he didn't take a more active part openly in this transaction was that he was too busy as electrical inspector, and I think the evidence has now shown that probably the reason—there were probably other reasons for it."

Appellant now claims this statement was a suggestion that appellant was concealing something. We do not so regard it. Apparently appellant's counsel did not then think the remark improper as no objection was interposed, and the appellant himself, as in answering a question, said, "There was no other reason". The appellant was not prejudiced. A short time later the prosecutor was making inquiry of the appellant regarding one of the transactions. The following ensued:

"Q. It says that the man was paid fifty dollars, and you heard Mr. Bradshaw come up here and testify that that came out of the veteran's file; was that true? A. I don't know anything about this. This is the first time I seen it. My signature does not appear on it, I know nothing about this contract.

"Q. Your signature appears on none of these instruments, is that your testimony? A. I didn't say that. I said it doesn't appear on that instrument.

"Q. His Honor was asking you a few moments ago about your familiarity with the affidavits that are signed in connection with the closing of these matters. When a man has to swear a lie in order to accomplish, as you say, the exercise of his rights, do you think that is a scheme, trick, or device? A. If any man swore a lie I know nothing

about it. I didn't swear a lie to anything.

"Q. I think the record is quite clear, Mr. McClanahan, that you stayed completely away from the paper work as much as possible. That is not my point.

"Mr. Cash: That is arguing with the witness and prejudicial. I ask that he be instructed not to make further statements like that.

"The Court: That is right."

No useful purpose was served by the United States Attorney arguing with the appellant but we do not see that it did harm. The court stopped the colloquy as soon as objection was interposed and the examination continued.

■ In argument to the jury, Government counsel made reference to the failure of the appellant to call Joe Jarrard as a witness, he being the attorney who had advised the appellant. The failure of a party to produce as a witness one peculiarly within the power of such party creates an inference that such testimony would be unfavorable, and may be the subject of comment to the jury by the other party. Ford v. United States, 5 Cir., 1954, 210 F.2d 313. It is said that no inference arises, and hence no comment is permissible, "where the person in question is equally available to both parties; particularly where he is actually in court; though there seems to be no disposition to accept such a limitation absolutely or to enforce it strictly". Wigmore, Evidence, Vol. II, pp. 169–171, § 288. Here the person not called was or had been the appellant's attorney and it might be expected that his testimony, if given, would corroborate that of the appellant as to the legal advice given. In such situation it cannot be said that the attorney was as available to the prosecution as to the defense. The rule is thus stated:

"* * * the question of equal availability of a witness not called is largely a question of fact, and various courts have regarded all manner of circumstances as bearing

upon the matter." Jones, Commentaries on Evidence, Vol. I, pp. 169–170, § 98.

It has been well said that "the availability of a witness is not to be determined from his mere physical presence at the trial or his accessibility for the service of a subpoena upon him. On the contrary, his availability may well depend, among other things, upon his relationship to one or the other of the parties, and the nature of the testimony that he might be expected to give in the light of his previous statements or declarations about the facts of the case." Deaver v. St. Louis Public Service Co., Mo.App., 199 S.W.2d 83, 85.

█ Ordinarily no inferences are permitted as a result of the failure to call to the witness stand one whose testimony would be privileged. However, when the appellant testified as to the legal advice given him he waived the privilege he could otherwise have asserted to the testimony of his attorney; and such waiver would also raise the inference that the testimony would be unfavorable and allow the comment to the jury of the failure to call him as a witness. See Wigmore, Evidence, Vol. II, p. 167, § 286.

The appellant also urges that the conviction and sentence cannot stand because in his jury argument counsel for the United States referred to the appellant as a "profiteer" and as "top dog", and because of references to Skinner and the participating veterans as the "tentacles of the octopus", inferring, so appellant says, that he was the "octopus". These words, in the context in which they were used, did not go beyond proper comment and no harm resulted.

The failure to mention other matters urged by appellant does not mean that they have gone unnoticed. We have considered all questions raised and finding in none any error requiring reversal, the judgment appealed from is

Affirmed.

CAMERON, Circuit Judge, concurs in the result.