UNITED STATES of America,
Appellant,

v.

Patrick H. DE WITT et al., Appellees.

No. 17101.

United States Court of Appeals
Fifth Circuit.

April 3, 1959.

Rehearing Denied June 10, 1959.

Maurice S. Meyer, Atty., Dept. of Justice, Washington, D. C., Samuel D. Slade, Acting Chief, Appellate Section, Dept. of Justice, Washington, D. C., George Cochran Doub, Asst. Atty. Gen., Russell B. Wine, U. S. Atty., San Antonio, Tex., for appellant.

W. C. Peticolas, George W. Finger, El Paso, Tex., Andress, Lipscomb, Peticolas & Fisk and Scott, Hulse, Marshall & Feuille, El Paso, Tex., of counsel, for appellee.

Before TUTTLE, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Presented here are questions whether a real estate dealer is liable to the Government for the civil penalties and damages under the False Claims Act, 31 U.S.C.A. § 231 et seq. or damages for common law fraud, and whether a mortgage lender is liable for equitable restitution because the Veterans Administration guaranteed a purchase money loan to a veteran who did not then intend to occupy the property as his home. The District Court granted summary judgment in favor of the dealer-salesman as well as for the lender. The Government appeals.

The Complaint, filed August 14, 1956, covers fifty separate sales of real estate made to veterans in El Paso, Texas, by DeWitt and Rearick (Dealer) or their salesmen. Mortgage Investment Company (Lender) was the party who loaned the money in many, but not all, of these transactions. As to twenty-nine specified transactions, the parties made a stipulation. The Court, however, in granting summary judgment against the Government lumped these and the other twenty-one transactions together as though the facts were identical.

Subsequent to the judgment below an event occurred which considerably alters this litigation, and certainly the nature and reach of the civil penalties under the False Claims Act. In May 1958 the Supreme Court decided United States v. McNinch, 356 U.S. 595, 78 S.Ct. 950, 2 L.Ed.2d 1001, and Rainwater v. United States, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed. 2d 996. Up to that time the Government was contending, as they had in a somewhat similar situation before us in United States v. Cochran, 5 Cir., 1956, 235 F.2d 131, certiorari denied 352 U.S. 941, 77 S.Ct. 262, 1 L.Ed.2d 237, approved in note 10 of McNinch, that when the Dealer falsely represented to the Lender that the veteran intended to occupy the property as his home a false claim as to the whole transaction was made against the Government since it was thereby induced to guarantee payment of the loan. Mc-

Ninch, of course, held that under the False Claims Act,[1] extension of the Government's credit was not the making of payment of a claim.

■ In terms of dollars involved, the Government's complaint under the False Claims Act nearly collapsed. But there was yet enough of a relatively small item to make it into a case of substantial proportions. For under the basic veterans legislation a so-called gratuity, generally in the sum of $160, was payable out of public funds to the Lender to be applied by it on the veteran's loan. 38 U.S.C.A. § 694(c). This was the making and payment of a claim, Rainwater v. United States, supra, and if other conditions are satisfied this sets in train the imposition of a $2,000 penalty for each separate transaction.

In addition to this the Government seeks against the Dealer (and salesmen) the (1) difference between the Veterans Administration valuation and the higher price obtained in the Dealer's sale to a third party, (2) the cancellation of all Certificates of Guaranty if not in the hands of bona fide third parties, and as to all Certificates of Guaranty not thus cancelled, that (3) the Government be indemnified for any money which the Veterans Administration ultimately is required to pay by reason of the loan guaranties. Number (1) affirms the sale to the third party and seeks a part of the fruits of it, and this seems completely inconsistent with (2) and (3).

Each, however, rest on notions of common law fraud, United States v. Borin, 5 Cir., 1954, 209 F.2d 145, with no aid from the False Claims Act.

While the Lender was included in these broad prayers, it is now conceded that no fraud as such was charged or made out as to it. Money relief against it is restricted, therefore, to restitution of the gratuity payments received. Other relief is restricted to a cancellation of Certificates of Guaranty on mortgages not assigned to bona fide third parties. It is uncontradicted that no mortgages remain unassigned, so the suit as to Lender relates to the restitution of the gratuities only.

Discussion of the main problem is much simplified by considering it in terms of a transaction typical of those of the twenty-nine covered by the stipulation. The Dealer, as real estate agent for a seller, made a contract to sell a home to a veteran. The contract provided that it was subject to approval by the Veterans Administration. The veteran then made application for a Home Loan Guaranty. This application stated that he intended to occupy the house as his home. The VA issued a Commitment to the Lender that it would thereafter issue a Certificate of Guaranty. Up to this point neither the sale nor loan was closed and the record is silent on the veteran's interim intention. But after issuance of the Commitment and either before or at the formal loan closing, the veteran aban-

1. The False Claims Act is nominally found at 31 U.S.C.A. § 231, see also §§ 232–235. But this gives a completely misleading impression. In the codification this is a blend of Revised Statutes §§ 3490 and 5438, the criminal portions of which are now found in 18 U.S.C.A. §§ 287 and 1001.

This is set out in note 1 of Rainwater v. United States, 1958, 356 U.S. 590, 78 S.Ct. 946, 947, 2 L.Ed.2d 996, 998, as follows:

"1. R.S. § 3490 (1878): 'Any person * * * who shall do or commit any of the acts prohibited by any of the provisions of section fifty-four hundred and thirty-eight [R.S. § 5438 (1878)] shall forfeit and pay to the United States the sum of two thousand dollars, and, in ad-

dition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act * * *.'

"R.S. § 5438 (1878): 'Every person who makes or causes to be made, or presents or causes to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval services of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent * * * shall be imprisoned at hard labor for not less than one nor more than five years, or fined not less than one thousand nor more than five thousand dollars.'"

doned his intention of occupying the house. Knowing this, but before actual closing of the loan, the Dealer agreed with the veteran to buy the house for a specified price. The loan was thereupon closed, the deed delivered to the veteran, and the Lender advanced the funds to the account of the Seller on behalf of the Purchaser, the veteran, under the loan made to him. Simultaneously, but unknown to Lender, the veteran deeded the house to Dealer who thereafter sold it at a profit to a third party having no veteran's eligibility.

The result was that such sale was financed almost altogether (substantially 100%' of the VA's appraised value) by the Federally guaranteed veteran's loan though neither the Dealer nor the subsequent third party Purchaser were eligible in that transaction for the benefits accorded by Congress on behalf of a grateful Nation.

As to the Dealer two problems emerge from this. First, was this a violation of the basic Servicemen's Readjustment Act of 1944, 38 U.S.C.A. §§ 694, 694a, 694d, and pertinent regulations? Second, if it was, did the Dealer's activities in relation to the sale, the veteran and the Lender constitute the making or causing to be made of a claim " * * * knowing such claim to be false, fictitious, or fraudulent * * * " under the False Claims Act? On the first, the Government contends that the statute requires that the veteran, both at the time of loan application and at the time of loan closing, must intend to occupy the house. The Dealer, on the other hand, asserts that until the 1956 amendments [2] the bona fide intention [3] relates only to the time of the loan application.

The dealer makes two principal arguments in its behalf. First, Congress, if it did not mean to change the law, i.e., add to it something which formerly was missing, at least thought the matter unclear enough to require a clarifying amendment.[4] The Dealer's next step is

---

2. The Amendment added the following new subsection to § 694d:

"(d) No loan for the purchase or construction of residential property shall be financed through the assistance of the provisions of this title unless the veteran applicant, at the time that he applies for the loan, and also at the time that the loan is closed, certifies * * * that he intends to occupy the property as his home. No loan for the repair * * * of residential property shall be financed through * * * this title unless the veteran * * *, at the time that he applies * * *, and also at the time that the loan is closed, certifies * * * that he occupies the property as his home. For the purpose of this title the requirement that the veteran recipient of a guaranteed or direct home loan must occupy or intend to occupy the property as his home shall be construed to mean that the veteran as of the date of his certification actually lives in the property personally as his residence or actually intends upon completion of the loan and acquisition of the dwelling unit to move into the property personally within a reasonable time and to utilize such property as his residence." 38 U.S.C.A. § 694d(d), 70 Stat. 914.

3. On this record this is not the case of trading in veterans' rights where the veteran never had any real intention of acquiring the house such as we have dealt with in McClanahan v. United States, 5 Cir., 1956, 230 F.2d 919, certiorari denied 352 U.S. 824, 77 S.Ct. 33, 1 L.Ed.2d 47; Russell v. United States, 5 Cir., 1955, 222 F.2d 197; and Corcoran v. United States, 5 Cir., 1956, 229 F.2d 295.

4. As is customary both parties work over the legislative history to glean a few grains of help. H.R.Rep. No. 1971, 84th Cong., 2d Sess. 2, 5, 6 (1956); U.S.Code Congressional and Administrative News 1956, p. 4085; Analysis of 1956 Amendments, Veterans' Administration Loan Guaranty Program, P.L. 898, House Committee on Veterans' Affairs (Aug. 3, 1956); S.Rep. No. 2489, 84th Cong., 2d Sess. 4 (1956).

We have assiduously declined to read or consider Hearings Before the Subcommittee on Housing of the House Committee on Veterans' Affairs, 84th Cong., 1st Sess. (1955), pt. 200, 84th Cong., 2d Sess. (1956), as to which considerable reference is made in the various briefs, as this relates to hearings in which evidence on the merits of this case was given, but which is not properly in the record here or below as facts upon which summary judgment was granted or denied.

to say that if Congress was uncertain about what it had legislated, then the citizen (Dealer) was entitled to the same luxury. Second, under the mechanical system [5] for processing veterans' loans reflected by the statute and implemented by regulations, the veteran was to sign only the original loan application. Consequently, the Dealer asserts, Congress hardly could have meant that the veteran was making two representations as to two different intentions—one expressed in the paper, the other implied in accepting the loan funds.

On careful consideration of these arguments we think they are without decisive merit. The law might have been more clearly worded. But when the obvious purpose of this legislation to supply badly needed homes in large numbers to the millions of service people returning to civilian life is taken into account, the Act seems plain enough. The statute provided that the United States would guarantee 60% of the purchase money loans upon houses purchased in accordance with the terms and provisions of the program. Not less than three times did the Act define loans eligible for guaranty in terms of those made to a veteran to be "used for purchasing residential property or constructing a dwelling *to be occupied at his home* * * *."[6] (Emphasis supplied.)

---

**5.** This process goes through six steps:

*Step One.* The veteran made a contract to buy a house. In a typical contract under "Terms of Sale" it provided "No * * * dollars cash * * * on delivery of deed. $8350.00 to be financed on G.I.—20 year loan. This sale is subject to approval by the Veterans' Administration and the lending agency. * *."

*Step Two.* The veterans signed VA form for Application for Home Loan Guaranty or Insurance. This was also signed by the Lender. This form transmitted veteran's eligibility papers, copy of Certificate of Reasonable Value (appraisal), credit report and the sales contract. Under "Purpose, Amount, and Terms of Proposed Loan—give narrative description of purpose of loan" it was stated "to purchase a home."

*Step Three.* The VA then issued to Lender a Certificate of Commitment stating that "the Application * * * has been examined and the loan determined to be eligible for guaranty" but then provides that: "Upon receipt of this Certificate of Commitment and of a duly executed 'Certification of Loan Disbursement' showing full compliance with the applicable regulations, the Administrator will issue: A certificate of Guaranty for 60 percent of the Loan Amount Reported * * *."

*Step Four.* The Lender, after disbursing the amount of the approval loan, signed and filed with the VA its Certification of Loan Disbursement which states:

"This Is To Certify That:

"(1) The proceeds of the loan were expended for the purposes described in the * * * Application originally submitted and in the amounts shown in the statement of loan disbursements and costs hereinafter set forth.

"(2) There has been no change in the identity of the property or security described in the * * * Application except as follows: [none]

* * *

"(5) The loan conforms otherwise with the applicable provisions of the Act and the regulations."

*Step Five.* Thereafter the VA delivered to the Lender its Loan Guaranty Certificate which states:

"This is to certify that pursuant to the Servicemen's Readjustment Act of 1944 * * * and the regulations effective thereunder on the date of this certificate, 60 percent of the indebtedness outstanding from time to time under the loan identified above is guaranteed."

*Step Six.* Usually within about sixty days the VA sent to Lender a check for the amount of the 4% gratuity, usually $160, which, in accordance with a prior written direction signed by the veteran, Lender applied on the loan or, in a few cases, for the payment of insurance.

**6.** Section 694a(a) provided:

"Any loan made to a veteran under this subchapter, the proceeds of which are to be used for purchasing residential property or constructing a dwelling to be occupied as his home or for the purpose of making repairs, alterations, or improvements in property owned by him and occupied as his home, is automatically guaranteed if made pursuant to the provisions of this subchapter * * *." 38 U.S.C.A. § 694a(a).

Subsection 694a(b) provides for non-automatic loans, i. e., prior approval loan guaranties where the veteran's dwelling is to be "occupied as his home." Sec-

The statutory mandate was that the loans be for the purchase, construction or improvement of a dwelling to be occupied by the veteran as his home. The guaranty was for the *making* of the loan, not the agreement to make it. Issuance of the Certificate of Commitment (*Step Three*, note 5, supra) was, of course, an important thing. But it did no more, and consistent with the law could do no more, than assure[7] the holder that if the loan represented in the Application is made in accordance with the Act and regulations, as the Certificate of Disbursement expressly recites the facts to have been, then the Government will guarantee the loan.

■ The Act therefore required that at the very time the loan was closed the veteran intended to occupy the house as his home. In the twenty-nine stipulated cases this was not so. In the remaining cases the Government was entitled to show by stipulation, or by evidence on motion for summary judgment, or trial, that this was not so.

What is the significance of this against the Dealer under the False Claims Act? On this we are, of course, concerned only with the transactions in which the 4% gratuity was paid. Where none was paid, there was no "claim." McNinch v. United States, supra.

The Dealer obtained summary judgment presumably on the basis reflected in the District Court's so-called Findings of Fact. Of course, in a summary judgment proceeding under F.R.Civ.P. rule

56, 28 U.S.C.A. they cannot serve as such since there has been no trial. At best they are statements of those things which are established as uncontradicted as a matter of law or, in terms of the rule, as to which there is "no genuine issue," or reasons why the Court so concludes. These "findings of fact" were that the veteran intended in good faith to occupy the house as his home when he signed the application for the loan; that "at the time these loans were being made [the Dealer and Salesman] did not know that a Certificate of Loan Disbursement was required to be made, and, therefore, could not have knowingly caused a false statement of any nature to have been made in such certificate"; that the Dealers "thought that after the veteran had in good faith made application for VA guaranty and the Certificate of Commitment was issued, the veteran could sell, rent or do what he pleased with his home;" and that "much confusion, uncertainty and conflicts in the law and regulations arose covering transactions * * *" of this kind. The so-called conclusions of law determined that the "crucial time for intent to purchase a home for occupancy was at the time the veteran made application for a home loan * * *"; and "* * * the veteran could sell or do as he pleased with his home after approval of the application and issuance of the commitment * * * and before the loan was closed"; and "in view of the uncertainty and reasonable doubt about the law in effect at the time these loans were made, it would

---

tion 694(a), (d), (e) and (f) authorize automatic and prior approval loans generally.

7. This is spelled out in the Regulations. "(d) A certificate of commitment shall entitle the holder to the issuance of the evidence of guaranty * * * upon the ultimate actual payment of the full proceeds of the loan for the purpose described in the original report and upon the submission within 30 days thereafter of a supplemental report showing that fact and: * * *,
"(4) That the loan conforms otherwise with the applicable provisions of the act and the regulations concerning

guaranty or insurance of loans to veterans.
"(f) * * * No certificate of commitment shall be issued and no loan shall be guaranteed or insured unless the lender, the veteran, and the loan are shown to be eligible; * * *.
"(g) Subject to compliance with the regulations concerning guaranty * * * of loans to veterans, the certificate of guaranty, * * * will be issuable within the available entitlement of the veteran on the basis of the loan stated in the final loan report or certification of loan disbursement. * * *." 38 C.F.R. § 36.4303 (1956).

not be equitable or just at this late date to impose * * * the heavy penalties and damages prayed for" by the Government.

We find nothing in the record to support any of these statements. The sole proof to show the nonexistence of genuine controversy was the affidavit [8] of each of the Dealers and individual salesmen affirming that none of them had actual knowledge prior to December 1953 that the Lender was required to sign a Certificate of Loan Disbursement or that the Lender was required to certify anything in connection with the loan.

■ Whatever our differences, later discussed, on the grant of the Government's counter motion for summary judgment, we are in full agreement that granting one for the Dealer and Salesmen was too hasty action. Putting to one side the complete absence in twenty-one transactions of the facts stipulated as to the twenty-nine, the whole thing for all fifty cases depends on the sufficiency of the affidavit, note 8, supra, which undertakes to state on oath that none of the Dealer-Salesmen had "actual knowledge" that a Certificate of Loan Disbursement had to be signed and filed by the Lender.

■ The Dealer urges, of course, that if these facts were deficient it was up to the Government properly to controvert them by evidentiary details. But as is too often the case, this is again a misreading of the principles so often announced by us on summary judgment. It is risky business to file no controversion. But it is not fatal to a trial on the issues involved if the moving papers show on their face that the matter is of a nature presenting a dispute, Inglett & Co. v. Everglades Fertilizer Co., 5 Cir., 1958, 255 F.2d 342, 348, or there is substantial doubt on it, Heyward v. Public Housing Administration, 5 Cir., 1956, 238 F.2d 689, 696; Bruce Construction Corp. v. United States for Use of Westinghouse Electric Supply Co., 5 Cir., 1957, 242 F.2d 873.

The affidavit here falls in that category. To deny that one had "actual knowledge" is really a conclusion. Stated in this way—and undoubtedly so out of a desire fairly to represent the matter without misleading or dishonest exaggeration—it suggested that if they "knew" it was by the process of constructive or legal imputation. That would, or might, depend on what subsidiary details were known. Yet none of these was stated. Moreover, in the context of this total record, which included the stipulation, the specimen papers in the six steps of the transaction, note 5, supra, the Court had to recognize that there was a serious question of what these extensive real estate Dealers and Salesmen knew about the Veterans Housing program.

---

8. The verified motion for summary judgment stated:

"These Defendants state that up until December of 1953 they had no actual knowledge that the lender was required to sign a Certificate of Loan Disbursement at the time of the closing of the loan. In fact, these Defendants * * * had no knowledge that there was any such instrument as a Certificate of Loan Disbursement and had no knowledge that the lender was required to certify anything in connection with the loan. * * * these Defendants, having no knowledge that such a certificate was required or made, could not under any circumstances conspire or cause to be made a certificate of which they had no knowledge. * * * Since [none of] the Defendants, * * * had any actual knowledge that such certificate was required to be made or was actually made, they could not have caused such false certificate to have been made.

"3. * * * In each instance, the contract of sale between the seller and the veteran was made subject to approval of the loan by the Veterans Administration, and when such approval was made, and in each instance the approval was made, by the Veterans Administration, these Defendants understood that the veteran had purchased the house and that thereafter the veteran could sell such house and that such veteran did not have to intend to occupy the house at the time of the loan closing. That the Defendants acted in good faith in disposing of the properties or purchasing the properties under these circumstances. * * *."

**400**

What is the consequence of this conclusion? We are, first, unanimous that summary judgment for the Dealer and Salesmen under the False Claims Act was erroneous, and that this action as to both the 29 and 21 claims must be reversed. Second, as to the remaining 21 claims, there must be a trial. Our differences arise solely as to the further disposition of the 29 claims. While failure to grant summary judgment is not an appealable order as such, 3 Barron, Holtzoff & Wright, Federal Practice and Procedure § 1242 (1958); 6 Moore, Federal Practice No. 56.21[2] (2d ed. 1952), Judges TUTTLE and JONES are of the opinion that the terms of the stipulation [9] are so emphatic that under the principles we have announced, there can be no genuine issue of fact as to the 29 claims so that on remand the District Court must grant the Government's motion. See Yorkshire Indemnity Co. of New York v. Roosth & Genecov Production Co., 5 Cir., 1958, 252 F.2d 650, 657–58. This summary judgment will be for double the $160 gratuity and the statutory penalty as to each of the 29 transactions. The Court is of this opinion because the statute, as interpreted by us, and knowledge of which is, of course, imputed to these persons, requires that the veteran have the required intention concerning the use of the property as a home at the time of the loan closing. Since it was stipulated that he did not,

the simultaneous closing of the transaction and the loan by the Dealer, knowing that a nonveteran was to acquire the property, meant that the Dealer was making a false representation. This constituted a false claim because the statute, note 1, supra, covers a person "who shall make[s] or cause[s] to be made, or present[s] or cause[s] to be presented * * * any claim * * * knowing such claim to be false, fictitious, or fraudulent." Judge BROWN, on the other hand, for the reasons subsequently detailed by him, is of the view that the 29 claims should be remanded for a trial.

This brings us to the Lender. We are of the opinion that summary judgment in Lender's favor was correct and should be affirmed. As it is admitted that Lender did nothing but make the loans on what it thought was a valid transaction and had no knowledge, actual or constructive, that the veteran no longer intended to occupy the house as his home, the Lender's action was not within the False Claims Act. Neither this Act nor the Acts of Congress providing for loan guaranties were intended under circumstances such as these to impose on such lenders the burdens which the contrary result would bring about. See also 38 U.S.C.A. § 694k.

The judgment is therefore affirmed as to Mortgage Investment Company of El Paso, Texas, but is reversed and remanded [10] for further and other consistent

---

9. "In each Cause of Action hereafter enumerated the seller, represented by De-Witt and Rearick, contracted to sell a house for a price set forth in the contract and such contract contained a provision that the sale was subject to approval by the Veterans Administration and the lending agency. The veteran made application for Home Loan Guaranty, stating in the application that he intended to occupy the house. After the Veterans Administration issued its commitment to guarantee the loan and *prior to, immediately before, or at loan closing the veteran informed Patrick H. DeWitt, Harry O. Rearick or one of their salesmen that due to his change of circumstances he had abandoned his*

*original intention of occupying the house. Thereupon DeWitt and Rearick agreed with the veteran to purchase his house for a sum of money.* In each instance the veteran closed the loan and simultaneously deeded the house to Harry O. Rearick for DeWitt and Rearick." (Emphasis supplied.)

10. If in causes of action Numbers 32 and 33, no gratuity was in fact paid, and the 41st cause of action was not brought within the six-year limitation, such claims will remain for common law fraud only. Recovery or relief as to causes of action under the False Claims Act will not include relief in paragraphs (2) and (23) (b) of the original Complaint and paragraphs (2) and (27) (b) of the Amend-

proceedings as to the Dealer and Salesmen.

Affirmed in part and reversed and remanded in part.

JOHN R. BROWN, Circuit Judge (dissenting).

I differ with the Court in only one respect. I would reverse and *remand* for trial the 29 claims covered by the stipulation. The Court, by its action, orders the entry of summary judgment for the Government.

## I.

First, I think that the Trial Court should be free to determine whether the Dealer-Salesmen might not rightfully be permitted to withdraw from this stipulation. Stipulations are to advance the cause of justice, to simplify fact settings, to sharpen questions of law, and permit a decision on them. Where, on the resolution of the law point (such as we have made on the question of the veteran's intent to occupy the home) adherence to the stipulation would or might produce an injustice or cause an unintended hardship, the Court may relieve counsel of their stipulation. Indeed, we regard the right and power of the Trial Judge to do this as vital and indispensable. Laird v. Air Carrier Engine Service, Inc., 5 Cir., 1959, 263 F.2d 948; and see Brinson v. Tomlinson, 5 Cir., 1959, 264 F.2d 30; Carnegie Steel Co. v. Cambria Iron Co., 1902, 185 U.S. 403, 414, 22 S.Ct. 698, 46 L.Ed. 968; Aronstam v. All-Russian Cent. Union of Consumers' Societies, 2 Cir., 1920, 270 F. 460, 464; Russell-Miller Milling Co. v. Todd, 5 Cir., 1952, 198 F.2d 166, 169.

The stipulation here on the 29 cases served a useful purpose. From the outset the Dealer-Salesmen took the position that *even though* they knew of the change in the veteran's intention, the Act, until the 1956 amendments, did not make that significant. To obtain a square ruling on that legal point, they

stipulated the *ultimate fact* that at the time of loan closing the veteran did not intend to occupy the house as his home. But that stipulation was made in a setting in which they took just as persistently the position that no one knew or had good reason to believe that the veteran's intention at that moment was significant. In other words, the contention was that if this was an incorrect understanding of the law, the error in understanding and application was innocent and in good faith.

The Dealer-Salesmen were good prophets in the Trial Court for the Judge held that they were right both on the construction of the Act and on the good faith. They guessed wrong as to us—completely as to the interpretation of the law, and partially on good faith—since we are all in agreement that this latter could not be disposed of on Dealer's motion for summary judgment.

But without any of the subsidiary details compressed into the ultimate fact conclusions set forth in the stipulation, this Court proceeds to hold that this amounts to a confession that Dealer made a false claim *knowing* it to be false, with the purpose falsely to obtain money from the Government.

I cannot believe that, in the posture of this case at the time the parties were anxious for the Trial Court to make a ruling on the construction of the statute, any businessman would have made any such concession, or that his lawyer would have permitted it to be done. At least the litigants and counsel should have the opportunity of having the Trial Court determine whether they are entitled to be relieved from the stipulation when the consequences are now so harsh and assuredly unexpected.

## II.

Second, and more important, I do not think that the nature of the *intent* under the False Claims Act can be elucidated

ed Complaint. McNinch, supra, cuts these off. If recoverable, this relief will depend upon applicable principles con-

cerning liability and measure of damages for common law fraud as to which we have expressed no opinion.

and determined apart from the *facts* which are yet unknown.

The Court ignores the intention of the person making or causing to be made the claim. It regards mistaken as synonymous with false, an erroneous understanding of the law the equivalent of an evil purpose to cheat the Government. It reasons that since the law has always required the veteran's purpose to occupy the property as his home at both the time of the application and loan closing Dealer made a false claim since it "knew" of this law, but nonetheless persisted in filing a claim for the gratuity which Dealer "knew" was not payable. This rests entirely on knowledge of the law being imputed to the Dealer on the necessary fiction—but still a fiction—that citizens are presumed to know the law.

The question here is whether that fiction can justifiably be transposed onto the False Claims Act to set in train the penalties which here exceed $67,000.

The False Claims Act does not so read. Nor can it safely be read apart from the facts. In other words, its true interpretation and construction on the nature of the *intention* of the one making the claim should not be determined as an academic matter.

The Act penalizes any person " \* \* \* who shall make \* \* \* any \* \* \* claim \* \* \* knowing such claim to be false, fictitious, or fraudulent \* \* \*," note 1, supra. As a minimum the statute requires that the claim be *known* to be false, *known* to be fictitious, *known* to be fraudulent. What is the meaning of the *known?* Is it enough that the statement made be inaccurate, incorrect, mistaken as a factual proposition? Or is it that the actor understands (a) that the facts are not as he represents them to be, and (b) that to submit the fact will be to obtain money from the Government which he knows is not owed? Is it that the actor must consciously appreciate

both the inaccuracy of the factual representation and the non-liability of the Government if the accurate fact were stated?

Similar questions arise as to the meaning of "false." Is a claim "false" merely because it is inaccurate or incorrect or mistaken? Must there be some purpose that one make a misrepresentation aware that it is wrong and is being asserted to obtain that which the actor knows is otherwise not payable? Does "false" acquire meaning by immediate association with "fictitious, or fraudulent" ? Does the intent to defraud have to exist with respect to a statement which is "false"? At least one Court indicates that this is so, United States v. National Wholesalers, 9 Cir., 1956, 236 F.2d 944, certiorari denied 353 U.S. 930, 77 S.Ct. 719, 1 L.Ed. 2d 724. Or is the intention to defraud confined to those assertions or representations which are "fictitious" or "fraudulent" as distinguished from "false"?

A careful examination of all cases under the False Claims Act fails to indicate any satisfactory answers to these serious questions. This Court then is making them wholly as an academic matter on the basis of a stipulation made in conclusionary terms.

A consideration of the False Claims Act and the analogous problem of intent in criminal cases demonstrates, I think, that we have jumped the gun on this serious question. That the False Claims Act is remedial and civil in nature, and hence not penal for purposes of double jeopardy [a] does not minimize its being "drastically penal" in fact. United States ex rel. Brensilber v. Bausch & Lomb Optical Company, 2 Cir., 1942, 131 F.2d 545, affirmed 320 U.S. 711, 64 S.Ct. 187, 88 L.Ed. 417. Indeed, here we are dealing with $67,000 as the penalty (including double the gratuity) in the 29 cases with the prospect of another $48,000 as to the remaining 21. To impose such terrific consequences upon a citizen

---

a. See United States ex rel. Marcus v. Hess, 1943, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443; Rex Trailer Company,

Inc. v. United States, 1956, 350 U.S. 148, 76 S.Ct. 219, 100 L.Ed. 149.

because he deliberately set out on a course to obtain money from the Government which he knew was not rightfully due would be one thing. Congress might well have intended that result. To impose such consequences merely because the citizen (and some fine lawyers advising him) guessed wrong on the law—or guessed wrong on what Court would someday hold he had guessed wrong on the law—is quite another thing. It would be surprising that Congress expected to hold the citizen to such prescience when the sovereign's own judges are known not only to make similar miscalculations, but the judiciary, with its hierarchy of successive appellate courts, is established as a recognition of the fact that judges will make mistakes on the law.

Much of the quibbling [b] about the remedial or civil or penal nature of the False Claims Act is put to rest by the latest characterizations of this Act by the Supreme Court.[c]

As we are "construing the provisions of a criminal statute * * *," United States v. McNinch, 356 U.S. 595, at page 598, 78 S.Ct. 950, at page 952, 2 L.Ed.2d 1001, note c, supra, principles relating to criminal law are of immediate relevance. "Knowing" the claim to be false then is equivalent, or at least akin, to wilfully submitting a false claim. "The two words 'knowingly' and 'wilfully' are often used as equivalents. Certainly, the mere omission of the word 'wilfully' is not to be construed as eliminating the element of criminal intent from the crime." Zebouni v. United States, 5 Cir., 1955, 226 F.2d 826, 828. In the context of this very Act relating to veterans' housing, we have defined wilful to mean "conscious that what he was doing was unlawful." Corcoran v. United States, 5 Cir., 1956, 229 F.2d 295, 299.

The process in reaching the result in this case apparently is that (a) since the implied [d] representation that the veteran would occupy the house as his home was

**b.** The dissent in United States v. Tieger, 3 Cir., 1956, 234 F.2d 589, 592. 595, certiorari denied 352 U.S. 941, 77 S.Ct. 262, 1 L.Ed.2d 237, is typical. In McNinch, 356 U.S. 595, 600, 78 S.Ct. 950, 2 L. Ed.2d 1001, note 10, the majority holding, not the dissent, was approved.

**c.** "But it must be kept in mind, as we explained in Rainwater, that in determining the meaning of the words 'claim against the Government' we are actually construing the provisions of a criminal statute. Such provisions must be carefully restricted, not only to their literal terms but to the evident purpose of Congress in using those terms, particularly where they are broad and susceptible to numerous definitions. * * *" United States v. McNinch, 356 U.S. 595, 598, 78 S.Ct. 950, 952, 2 L.Ed.2d 1001, 1004. This referred specifically to note 8 and the related text in Rainwater which stated: "In reaching our conclusion, we are aware that the civil portion of the Act incorporates, as a test of liability, the provisions of the criminal section as they were set out in § 5438 of the Revised Statutes of 1878, and that according to familiar principles the scope of these provisions should be confined to their literal terms. Yet even penal provisions must be 'given their fair meaning in accord with the evident intent of Congress.' United States v. Raynor, 302

U.S. 540, 552, 58 S.Ct. 353, 359, 82 L.Ed. 413." Rainwater v. United States, 1958, 356 U.S. 590, at page 592–593, 78 S.Ct. 946, at page 948, 2 L.Ed.2d 996, 999.

**d.** The representation was implied only. Even on the Government's theory the Dealer, up to the time of the loan closing, has done no wrong. The Dealer does, of course, know of the original Application for Home Loan Guaranty or Insurance handled as set forth in Step Two, note 5, supra. But at that time, under the stipulation, all was in order. The wrong arises when, in Step Four, note 5, supra, the Dealer "causes" the Lender to loan the money and issue the Certification of Loan Disbursement. The closest it gets to representation of the Veteran's intent is the certificate that "(5) The loan conforms otherwise with the applicable provisions of the Act and the regulations."

This is also emphasized by the stipulation itself, note 9, supra. It does not state that Dealer knew of the veteran's change of intention and then concealed it from the Lender, or that Dealer knew that the loan could be guaranteed only if the veteran's intent remained the same. Nor does it state that Dealer knew that under the catch-all certification of item (5) quoted above this comprehended the veteran's then existing intentions.

incorrect, i.e., wrong, mistaken, that makes it false because (b) the various papers were deliberately delivered and the other actions were intentionally taken at the time of the loan closing and (c) the Dealer is charged with unlawful purpose since the law considers that a person intends the natural consequences of his acts.

But this is to do what we condemned in Hargrove v. United States, 5 Cir., 1933, 67 F.2d 820, 823, 90 A.L.R. 1276, 1280. "The court here fell into the error of not distinguishing between the elements of an offense, where the statute simply denounces the doing of an act as criminal, and where it denounces as criminal only its willful doing. In the first class of cases, especially in those offenses *mala prohibita,* the law imputes the intent. * * * In the second class of cases, a specific wrongful intent, that is, actual knowledge of the existence of obligation and a wrongful intent to evade it, is of the essence." McBride v. United States, 5 Cir., 1955, 225 F.2d 249, 253–254. See also Babb v. United States, 5 Cir., 1958, 252 F.2d 702, 707–708.

In assaying the legal consequences of action, there is a vast difference between intending to do the act which a statute might denounce and, on the other hand, purposely doing such act but with the added ingredient of a consciousness that it was illegal, i.e., in violation of known law. St. Johnsbury Trucking Company v. United States, 1 Cir., 1955, 220 F.2d 393; 22 C.J.S. Criminal Law § 29 (1940); 14 Am.Jur., Criminal Law § 23

(1938). A conviction for a false FHA loan application under 18 U.S.C.A. § 1010 penalizing the making of "any statement, knowing the same to be false" was reversed, Smith v. United States, 6 Cir., 1956, 230 F.2d 935, 939, for failure of the trial court to submit defendant's theory that what he had done in the loan transaction was done under the good faith belief that the action was permissible and that the lending bank official had so advised him.

The efforts [e] of this and other Courts in wrestling with the complex problem of the kind of intent required under any penalty statute should serve as a warning that we ought not to undertake the formidable task as academicians. We ought to judge the law on the facts, and the law against the facts.

In this case the precise problem is whether Congress intended that the heavy sanctions of the False Claims Act flow from the purposeful submission of facts which happen to be incorrect, or whether the actor must have been conscious that the asserted fact was wrong and nevertheless submitted it deliberately knowing it to be incorrect and conscious that to do the latter was to claim a payment which the Government did not owe were the true facts known.

This should be answered in the light of facts, not an ultimate conclusion.

I, therefore, respectfully dissent to this extent.

Rehearing denied; BROWN, Circuit Judge, dissenting.

e. One soon gets back to the opinion in Morissette v. United States, 1952, 342 U.S. 246, 250–252, 72 S.Ct. 240, 96 L.Ed. 288. See also 22 C.J.S. Criminal Law §§ 29, 30; 14 Am.Jur., Criminal Law §§ 23, 24; Reyes v. United States, 9 Cir., 1958, 258 F.2d 774, 782–83; Annotation Wilfullness or intent as an element of offenses denounced by Federal Income Tax Law, 90 A.L.R. 1280 (1934). We have dealt with it many times. At the head of the list should be the thorough opinion written by Judge JONES in McBride v. United States, 5 Cir., 1955, 225 F.2d 249, 253–255. See also Bernstein v. United States, 5 Cir., 1956, 234 F.2d 475, 485; Fallen v. United States, 5 Cir., 1955, 220 F.2d 946, 948; Baker v. United States, 5 Cir., 1955, 227 F.2d 376, 378; Berkovitz v. United States, 5 Cir., 1954, 213 F.2d 468, 472–475; Russell v. United States, 5 Cir., 1955, 222 F.2d 197; Rent v. United States, 5 Cir., 1954, 209 F.2d 893, 899–900.