## UNITED STATES *v.* RAYNOR.*

No. 146. Argued November 12, 15, 1937.—Decided January 3, 1938.

---

* Together with No. 147, *United States* v. *Fowler,* also on writ of certiorari to the Circuit Court of Appeals for the Seventh Circuit.

*Assistant Attorney General McMahon,* with whom *Solicitor General Reed,* and *Messrs. William W. Barron* and *W. Marvin Smith* were on the brief, for the United States.

*Mr. John Elliott Byrne,* with whom *Messrs. George R. Jeffrey* and *W. H. F. Millar* were on the brief, for respondents.

Mr. Justice Black delivered the opinion of the Court.

Respondents were convicted in a federal district court for violating a provision of § 150 of the Criminal Code,[1] which reads:
"whoever shall have or retain in his control or possession after a distinctive paper has been adopted by the Secretary of the Treasury for the obligations and other securities of the United States, any similar paper adapted to the making of any such obligation or other security, except under the authority of the Secretary of the Treasury or some other proper officer of the United States, shall be fined not more than $5,000, or imprisoned not more than fifteen years, or both."

The Circuit Court of Appeals reversed,[2] holding that the act did not prohibit the possession of any except the distinctive paper adopted by the Treasury, and that other paper was not prohibited even though it closely resembled the distinctive paper and was well suited for successful counterfeiting. The court accordingly believed that the evidence did not support a conviction.

The evidence disclosed that:

In 1928, the Secretary of the Treasury adopted a distinctive paper for obligations and securities of the United States; this paper was a high grade rag bond having a sharp rattle, very little gloss, and short fine silk fibers distributed throughout; in 1936, respondents had possession of paper of practically the same color, weight, thickness and appearance as this distinctive government paper and cut to the dimensions of twenty dollar government obligations; respondents' paper rattled like genuine money; it did not have red and blue silk fibers throughout, but red and blue marks were so expertly designed upon its surface that one judge, dissenting below, after

[1] 18 U. S. C., § 264; 35 Stat. 1116.
[2] 89 F. (2d) 469.

a careful examination of these marks with a magnifying glass, was still wholly uncertain whether they were actually woven in the fabric or were traced on the surface.

Did respondents' possession of this paper violate the act?

The paper was not only perfectly adapted for counterfeiting, but it is difficult to conceive of its use for any other purpose. The history and language of the act are both of importance in determining whether Congress intended to make it a crime to possess, without authority, so close an imitation of the genuine paper adopted by the Treasury.

1. The history of the law under which respondents were convicted dates from a special session of Congress in 1837. That Congress was called upon to pass legislation to meet emergency conditions following crop failures, general business distress, unemployment and discontent. Urged to action by these conditions, Congress authorized the issue of a then unprecedented amount of treasury notes. It had long been a criminal offense to make, utter, or pass counterfeit money. Realizing that the protection of the currency required more stringent laws against counterfeiters,[3] Congress made it a crime to possess any plate, blank note, or paper to be used for counterfeiting pur-

---

[3] Counterfeiting increases in periods of commercial distress, unemployment, and poverty. Even prior to 1837, poverty contributed to offenses against the currency, see Re Halmagh Ackerman, 5 N. Y. City Hall Rec. (1820) 140, and counterfeiters kept paper in their possession which was used for making counterfeit obligations, Re Guy Johnson and William Johnson al. William Price, John Strickland, and Edward O'Melly, 5 N. Y. City Hall Rec. (1820) 138. In 1837 the prospect of increased counterfeiting—due to distressed economic conditions and the fact that non-federal agencies, both public and private, had already put a large amount of paper in circulation—indicated the need recognized by Congress in strengthening the law. See, Dewey "Financial History of the United States," Longmans, Green & Co. (N. Y.) 1915, p. 233. See Knox, "United States Notes," Scribner's (N. Y.) 1899, p. 40 et seq.

poses.[4]  This early forerunner of the present act provided in part:

"If any person . . . shall have in his custody or possession *any paper adapted to the making of bank notes, and similar to the paper upon which any such notes shall have been issued,* with intent to use such paper . . . in forging or counterfeiting any of the notes issued as aforesaid . . . such person . . . shall be sentenced" etc.

This original provision prohibited the possession of "similar" paper adapted to making "bank notes" but such "bank notes" obviously were to be forged or counterfeit— not genuine.  This first act thus prohibited—not the genuine—but counterfeit paper, intended to be made into counterfeit obligations, and its language and meaning were substantially reënacted in 1847, 1857, 1860, 1861 and 1862.[5]

Beginning December, 1860, Congress, to meet imperative needs, again authorized great increases in government obligations.  By July, 1862, new issues of currency and unsettled conditions had so stimulated counterfeiting that Congress made special funds available to detect and punish those guilty of the crime.[6]  Such action proved inadequate to curb counterfeiters, and in 1863, Congress reënacted, strengthened and strongly reinforced the 1837 prohibition against possession of paper for counterfeiting.[7] The 1863 law made it a crime to "imitate, counterfeit, make, or sell any paper such as that used, or provided to be used, for the fractional notes."  Although the law had prohibited the possession of paper imitating the genuine

---

[4] Act of October 12, 1837, c. 2, §§ 10, 11, 5 Stat. 201, 203.

[5] Act of January 28, 1847, c. 5, §§ 9, 10, 9 Stat. 118, 120; Act of December 23, 1857, c. 1, §§ 12, 13, 11 Stat. 257, 259; Act of December 17, 1860, c. 1, §§ 12, 13, 12 Stat. 121, 123; Act of July 17, 1861, c. 5, § 10, 12 Stat. 259, 261; Act of February 25, 1862, c. 33, §§ 6, 7, 12 Stat. 345, 347, 348.

[6] Act of July 11, 1862, c. 142, § 5, 12 Stat. 532, 533.

[7] Act of March 3, 1863, c. 73, § 8, 12 Stat. 709, 713.

since 1837, this 1863 amendment struck vigorously at all who in any manner trafficked in such imitation paper.

By July, 1864, the government had outstanding approximately two billion dollars in war obligations, and the counterfeiter had become a still greater public enemy. Under these circumstances, with more currency to be issued, and the necessity for protection from counterfeiters greatly accentuated, Congress once more reënacted the 1837 Act[8] and made it a more effective weapon against counterfeiters.[9] The element of intent was stricken from the offense and the mere unauthorized possession of imitation paper was made a crime. Congress also combined the phrase "paper adapted to the making of bank notes" with the phrase "similar to the paper upon which any such notes shall have been issued." It is the phrase resulting from this combination—*"similar paper adapted to*

[8] Act of June 30, 1864, c. 172, §§ 10, 11, 12, 13 Stat. 218, 221, 222.

[9] In the period preceding this enactment there was again a marked increase in counterfeiting. "There is reported to be in circulation throughout the United States, at the present time, over three thousand issues of counterfeit, spurious, raised and altered bank bills— an average of two issues to every bank in operation. Supposing each issue would average one thousand bills, which is a moderate calculation, there would be three million counterfeit bills in circulation; and the cry is, still they come!" Reedy, "The Universal Bank Note, Draft and Check Detector," New Orleans, 1858, p. 15. This growth resulted in alarming injury to the currency. "Annual Report, Assn. of Banks for the Suppression of Counterfeiting," Boston, 1859. After 1860, counterfeiting increased steadily. *Id.* 1860; *id.* 1862. "Specie payments were suspended on December 28, 1861. The war was carried on chiefly by the use of treasury notes as a circulating medium." Knox, *supra*, p. 84. See Hepburn, "A History of Currency in the United States." MacMillan (N. Y.) 1915, pp. 179–204. However, by October 1862, it was reported that counterfeiting was widespread in America and uneasiness was being felt among Americans about the genuineness of the treasury and other notes issued by the United States. "The Bankers Magazine," London, Vol. XXII, p. 615 (1862). Improved means of preventing counterfeiting in order to maintain public faith in the currency became of great importance.

*making such obligations"*—which was construed by the court below to limit the prohibited paper to the genuine Treasury-adopted paper. These phrases, carried in the law from 1837 to 1864, had obviously referred to any paper suitable for counterfeiting. If the Congress of 1864 did intend by combining these phrases to exempt from the act all who had possession of imitation paper, it thereby deliberately weakened the chance of the government to convict and punish counterfeiters. We do not impute such a purpose to Congress. By the change made in 1864 Congress undoubtedly intended to make the law a more effective weapon against counterfeiters. Indeed, two days after this amendment was passed Congress authorized a special appropriation to detect and punish counterfeiters.[10] It is beyond belief that Congress intended to relax the law against counterfeiters at a time when the Nation was engaged in financing a war. Such a construction would be neither logical nor reasonable. The section now under consideration is plainly the culmination of a long series of legislative acts, each of which has declared it to be a crime to have possession of paper, counterfeiting the distinctive paper, and suitable to be made into counterfeit obligations. Each change since 1837 was intended to make the possession of counterfeit paper more dangerous for counterfeiters.

Finding nothing in the history of this law which supports the construction given it by the court below, we proceed to an examination and analysis of the particular language believed to justify that construction.

2. That particular language is the phrase *"similar paper adapted to making such obligations."* The word "similar," and the phrase "adapted to making such obligations

---

[10] Act of July 2, 1864, c. 210, § 3, 13 Stat. 344, 351.

or securities," both describe the type of paper the possession of which is prohibited. The definitions given by the court below to this word and this phrase are irreconcilable.

That court defined "similar" to mean "somewhat alike"; "not exactly alike"; "like, but not exactly the same." "Similar paper," thus defined, cannot be identical with the distinctive paper adopted by the government, because while the two papers would be "somewhat alike," they would not be "exactly alike" or "exactly the same." Similarity is not identity, but resemblance between different things.[11] Under this definition, "similar paper," the possession of which is prohibited, is not identical with, but differs from the distinctive paper.

However, after giving this definition to similar paper (which is prohibited by the act), the court below concluded that the phrase "adapted to making such obligations" limits the prohibition of the act to the distinctive paper. This conclusion is not consistent with the determination that "similar"—also describing the paper prohibited—designates paper which is different from the distinctive paper. A construction that creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the act, and will carry out the intention of Congress.[12]

There is no inconsistency in the act unless it is assumed that the word "obligations" refers to genuine obligations only. Since words that have one meaning in a particular context frequently have a different significance in an-

---

[11] *Greenleaf* v. *Goodrich*, 101 U. S. 278, 282, 283. See, *Rhode Island Hospital* v. *Olney*, 16 R. I. 184; 13 Atl. 118.

[12] *New Lamp Chimney Co.* v. *Ansonia Brass & Copper Co.*, 91 U. S. 656.

other,[13] it is necessary to consider the context of the words "such obligations," in order to determine their significance. The provision of law here construed is the last of seven separate offenses set out in one paragraph of a chapter of the Criminal Code entitled "Offenses against the Currency." The provisions of this chapter were enacted to prevent and punish counterfeiting. Six closely connected companion offenses are set out in the same section with the offense charged against respondents and all either penalize the possession of, or trafficking in, counterfeit obligations or the materials and devices used to make such obligations.

Examining the context of the words under consideration we find that the word "obligations" appears throughout the Chapter relating to offenses against the currency, and does not always apply to "genuine" obligations, but may, and often does refer to "counterfeit" or "spurious" obligations. In order to distinguish between counterfeit and genuine instruments, the provisions in some instances specifically designate notes as "false, forged or counterfeited" as in § 149. On the other hand, § 152 makes it a crime for any person, without authority, to make tools to be used in printing "any kind or description of *obligation or other security of the United States now or hereafter to be authorized by the United States* . . ." . . . Although these quoted words are "any kind of . . . obligation . . . authorized by the United States," the reference is not to genuine obligations, but to counterfeit obligations, not only printed "without authority" but printed with counterfeit tools made by the counterfeiter. It is apparent from the context that in this instance the phrase "obligation . . . authorized by the United States" refers to a counterfeit

---

[13] *Porto Rico Sugar Co.* v. *Lorenzo*, 222 U. S. 481; *Lamar* v. *United States*, 240 U. S. 60; *Atlantic Cleaners & Dyers* v. *United States*, 286 U. S. 427.

obligation. Both before and since the 1837 act words such as "bills," "notes" and "obligations" have been used as meaning counterfeit instruments.[14]

The relative positions of the words we are examining are important. The first word describing the prohibited paper is "similar." Unless the paper possessed is "similar" to the distinctive paper of the government, its possession is not prohibited. Genuine obligations can only be made from the genuine distinctive paper, with a genuine design; with genuine lithographing; and with genuine signatures. Conversely, counterfeit obligations would be the result of designs, lithographing, signatures or paper—not gen-

---

[14] As illustrative, the following extracts from cases involving offenses against the currency refer to false or counterfeit instruments: "When a man has the possession of the number of *notes* alleged in the indictment, with an intention of uttering and passing them for the fraudulent purpose expressed, he has done all that, in words, is necessary to constitute the offense." *Commonwealth* v. *Cone*, 2 Mass. 132, at p. 134 (1806); "Without mentioning any other differences, it is sufficient to observe, that to constitute the crime described in the former, the possession of at *least ten bills is necessary* . . ." *Brown* v. *Commonwealth*, 8 Mass. 59, at p. 71 (1811); "Bowdain Brastow, was indicted and tried for passing a *$10 bill of the Merchants' Bank* . . ." Re Halmagh Ackerman, *supra*, p. 140 (1820); "In the same place, they found a copper-plate press, a plate for engraving *$2 bills on the Merchants' Bank*, and under the roller of the press, *a bill* of that description recently struck off." Re Guy Johnson & William Johnson al. William Price, John Strickland and Edward O'Melly, *supra*, p. 138 (1820); cf. *State* v. *Randall*, 2 Vt. (Aiken) 89, (1827); (cf. *Baldwin* v. *Van Deusen* where it is stated: "In reference to bank-bills, bills of exchange, promissory notes and securities for money, the natural and general, if not the universal, antithesis or opposite of genuine, is 'counterfeit.' Hence we say of a bank-bill it is a *genuine bill*—i. e., not a counterfeit bill . . ." 37 N. Y. 487, at p. 493, (1868)); see, *Wiggains* v. *United States*, 214 Fed. 970, at p. 971; "*The bonds* admittedly belonged to the plaintiff in error." *Forlini* v. *United States*, 12 F. (2d) 631, at p. 634; " . . . appellant visited the basement while counterfeiting operations were in progress and participated in conversations as to

uine, but merely "similar" to the genuine. When, therefore, Congress used the words "similar paper" it included within its prohibition an imitation or counterfeit of the genuine paper. The effect was the same as though it had prohibited possession of a government obligation bearing a signature "similar" to the signature of the Secretary of the Treasury. After the appearance of the word "similar," subsequent words descriptive of the prohibited paper require a construction that will give effect to the Congressional intent to prohibit the possession of paper which is an imitation or counterfeit of that adopted by the government.

In *United States* v. *Howell,* 11 Wall. 432, 436, this Court construed a similar statute which so far as pertinent provided:

"That if any person . . . shall falsely make, forge, counterfeit, or alter . . . any note . . . issued under the authority of this act, or heretofore issued under acts to authorize the issue of Treasury notes or bonds; . . . or shall have or keep in possession, . . . any such false, forged, counterfeited, or altered note . . . [such person] shall be . . . guilty of felony . . ." etc.

The defendant indicted under that statute urged that the words "such . . . note" referred back to those notes

---

the appearance of the bills that were being made and the necessity of putting more yellow in the coloring"; *Nebbelink* v. *United States,* 66 F. (2d) 178; "One *bill* was found in his clothes, and he volunteered to show the officers where the rest were. . . . The sole issue was as to whether after Hatlen showed him the *bills,* he co-operated with him in disposing of them . . ." *United States* v. *Gates,* 67 F. (2d) 885; "The *obligations* were described as United States notes and identified by denomination, series number, and plate numbers." *Simon* v. *United States,* 78 F. (2d) 454, at p. 455. The word "banknote" may mean—not a genuine—but a counterfeit obligation. Webster's New International Dictionary (Merriam, 1914) in defining the word "counterfeit" uses as an illustration, "The banknote was a *counterfeit.*"

that had been "issued under the authority of this act"; that notes issued under authority of the act were genuine; that the act, therefore, did not prohibit passing or possessing a counterfeit note.

This Court gave credit for the plausibility of such an argument, but said it was:

"at war with common sense, which assures us that the purpose of the act was to punish the making of counterfeits of the notes and bonds described in the statute. . . . We are to give due weight to all of the words employed in describing the instrument, . . . So we speak of a bank note. Now if the paper spoken of is a forgery it is not a bank note, which means an obligation of some bank to pay money. But here also the mind supplies the ellipsis which good usage allows, and understands that what is meant is a forged paper in the similitude of a bank note, or which on its face appears to be such a note." P. 436.

So, in this case, paper which was in the possession of an unauthorized person and which was merely similar to genuine government paper, could not possibly be adapted to making genuine government obligations. In this statute, the words "similar paper adapted to making government obligations" imply that the similar paper should be adapted to making obligations that purport to be genuine and valid, but are not.

This construction is not inconsistent with a grant of authority to certain officials to permit possession of the prohibited paper. In this same Chapter containing laws to protect the currency of the United States there are other similar grants of authority relating to counterfeiting devices and permission can also be granted to possess the actual counterfeiting instruments or obligations.

The fact that Congress revised and codified the criminal laws after the Court of Appeals in the case of *Krakowski* v. *United States,* 161 Fed. 88, held that the act only

prohibited possession of the distinctive paper does not detract from the soundness of this conclusion. One decision construing an act does not approach the dignity of a well settled interpretation.[15] It is not necessary to determine the effect of including this act in the Revised Statutes and the Criminal Code.

We are not unmindful of the salutary rule which requires strict construction of penal statutes. No rule of construction, however, requires that a penal statute be strained and distorted in order to exclude conduct clearly intended to be within its scope—nor does any rule require that the act be given the "narrowest meaning." It is sufficient if the words are given their fair meaning in accord with the evident intent of Congress.[16] Certainly, if Congress had intended to prohibit only the possession of distinctive paper it would have simply used the words "distinctive paper" instead of the distinguishing words "similar paper adapted to the making of any such obligation."

The evidence does support the conviction of respondents. The judgment of the Court of Appeals is reversed and the judgment of conviction is affirmed.

*Reversed.*

MR. JUSTICE SUTHERLAND, dissenting.

MR. JUSTICE McREYNOLDS, MR. JUSTICE BUTLER and I have reached a different conclusion.

The judicial function, as many times we have been told, does not include the power to amend a statute. And

---

[15] For prosecutions under the Act subsequent to the *Krakowski* case, *supra*, see the following cases: *United States* v. *Rosen* (W. D. Tex.), February 14, 1931; *United States* v. *Regsich and Grubich* (W. D. Pa.), December 16, 1920; *United States* v. *Marchetti* (N. D. Ohio), June 18, 1924; *United States* v. *Maratea and Plocket* (E. D. Pa.), January 21, 1932.

[16] *United States* v. *Giles*, 300 U. S. 41.

while penal statutes are not to be construed so strictly as to defeat the obvious intention of the lawmaker, nevertheless—"Before one may be punished, it must appear that his case is plainly within the statute; there are no constructive offenses." *United States* v. *Resnick*, 299 U. S. 207, 210.

We think the opinion just handed down, undertakes to import a meaning into the pertinent statute at war with its words. That statute requires the existence of four distinct elements before the accused can be held guilty of violating it: (1) the adoption by the Secretary of a distinctive paper for the obligations and other securities of the United States; (2) possession or retention by the accused of "similar paper"; (3) the paper to be "adapted to the making of any such obligation or other security"; and (4) the possession, or retention not to be under the authority of the Secretary of the Treasury or some other proper officer of the United States.

The word "similar," it is true, generally indicates resemblance and not exact identity, although in some cases it may mean "identical" or "exactly like." *Fletcher* v. *Interstate Chemical Co.*, 94 N. J. L. 332, 334; 110 Atl. 709. The distinction is illustrated by the decision of the Supreme Judicial Court of Massachusetts in *Commonwealth* v. *Fontain*, 127 Mass. 452, 454, where it was held that the words "similar offense" meant an offense identical in kind. The court said, "The word 'similar' is often used to denote a partial resemblance only. But it is also often used to denote sameness in all essential particulars. We think the Legislature intended to use it in the latter sense in the statute we are considering." To determine the precise meaning of the word here, we must turn to the statute. The crucial elements there disclosed are those embraced by clause (2), requiring that the paper possessed or retained be "similar paper"

to that adopted by the Secretary, and by clause (3) which requires that the paper be adapted to the making of "such" obligation or security. It is as necessary to give appropriate effect to the latter clause as it is to the former. It is not enough that the paper would be "similar" paper within the meaning of clause (2) standing alone; for it does not stand alone, but is associated with and qualified by clause (3). Nothing is better settled in the law of statutory construction than the rule that words by themselves may have a particular meaning, but that this meaning may be enlarged or restricted when considered in connection with other associated words. And this is more especially true where the associated words supplement and qualify the preceding ones as they do here.

In order to apply the rule, we must ascertain the meaning of clause (3), since that adds the requirement that the similar paper shall be adapted to the making of "such" obligation or security. That is to say, we first must determine the import of the word "such"; and that is disclosed by clause (1), providing for the adoption of distinctive paper for the obligations and securities of the United States. This means, and can only mean, genuine obligations and securities, since it cannot be supposed either that the Secretary, by clause (1), is authorized to adopt paper for any that are not genuine, or that his authority under clause (4) is not alone to permit possession of paper adapted to making genuine obligations but extends to paper which resembles the adopted paper only enough to make it adaptable for counterfeiting those obligations. It follows, necessarily, that it is genuine obligations and securities and not counterfeits of them that are embraced by the word "such" in clause (3).

The provisions of the statute were not meant to cover counterfeiting, or preparations antecedent to counterfeiting. Their whole purpose was to penalize possession or

retention by unauthorized persons of the distinctive kind of paper which the Secretary has adopted for the making of the obligations of the United States; language which, as we have said, necessarily imports genuine obligations, because if not genuine they would not be obligations of the United States at all.

The government, however, takes the view that the statute extends to the possession of paper suitable, not for making genuine obligations, but for *counterfeiting* them. And this view, as we understand it, is also taken by the court in its present opinion. The difficulty with that view, however, is that it requires the introduction of an amendment so that clause (3), instead of reading "adapted to the making of any such obligation," etc., will read "adapted to the making of *counterfeits of* any such obligation," etc. Such an assumption of legislative power is inadmissible.

That the paper here in question, even if in the hands of the Treasury, was not adapted to the making of genuine obligations, is beyond dispute. The distinctive feature of the paper adopted by the Secretary is the presence of short, fine red-and-blue silk fibers impregnated in and distributed throughout a high-grade rag bond paper. These silk fibers are entirely absent from the paper here in question; and while it might have been used for counterfeiting government obligations, it was not adapted to making the genuine articles. The present decision brings within the reach of the statute every stationer who has in his possession for sale any high-grade rag bond paper, if it is capable of being used for counterfeiting government obligations. For the statute, it will be observed, requires no criminal intent, and nothing beyond mere possession or retention.

The view of the statute which we have expressed was adopted thirty years ago by the Circuit Court of Appeals for the Second Circuit in *Krakowski* v. *United States*,

161 Fed. 88. In the meantime, Congress has left the statute in its original form. The government did not see fit to ask review of the *Krakowski* case, but has apparently acquiesced in it for all those years. This court should not be expected to disregard the established rules of statutory construction in order to remedy a situation which Congress could have cured, and may still cure, by a simple act of legislation. We think the well-reasoned opinion of the court below should be accepted and its judgment affirmed.