**UNITED STATES of America,**
**Plaintiff,**

v.

**Robert Shirley TAYLOR, Jeanette Duggins Taylor and Addison Sam Taylor,**
**Defendants.**

No. 59–CR–87.

United States District Court
E. D. Wisconsin.

Nov. 5, 1959.

Edward G. Minor, U. S. Atty., by Matthew M. Corry, Asst. U. S. Atty., Milwaukee, Wis., for plaintiff.

George D. Radler, Milwaukee, Wis., for defendant Robert Shirley Taylor.

Marjorie L. Marshall, Milwaukee, Wis., for defendant Jeanette Duggins Taylor.

Howard H. Boyle, Jr., Milwaukee, Wis., for defendant Addison Sam Taylor.

GRUBB, District Judge.

Defendants were indicted on a charge of transporting a Shetland pony[1] in interstate commerce, knowing it to be stolen, in violation of Section 2314, Title 18 United States Code. Defendants have moved to dismiss the indictment on the ground that the Shetland pony is not within the terms of the statute. The pertinent portion of the statute reads:

"Whoever transports in interstate * * * commerce any *goods, wares, merchandise,* securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud; * * *." (Emphasis added.)

The issue in this case is simply whether a pony, an animate object, is included within the terms "goods, wares, merchandise." As the term "goods" is the widest of the three, it alone will be considered.

Defendants urge that animate objects are not clearly and unmistakably included within the term "goods," and, therefore, the rule that penal statutes must be strictly construed should be applied.

To begin with, it is clear that the term "goods" is open to many interpretations. It is defined in Black's Law Dictionary as:

---

1. Of the value of $5,000 or more.

"A term of variable content. It may include every species of personal property or it may be given a very restricted meaning. * * *

"In *contracts*, the term 'goods' is not so wide as 'chattels,' for it applies to inanimate objects, and does not include animals or chattels real, * * *." (Emphasis added.)

At 38 C.J.S. Goods p. 940, it is said:

"The term is generally understood to mean personal estate as distinguished from realty, and to embrace every species of property which is not real estate or freehold."

Later at page 941 of the same work under the subtitle "Animate or Inanimate," it is pointed out that the term "goods" is less comprehensive than the term "chattels," but " * * * yet its full signification, especially in its legal sense, has a larger or more extensive application; thus the term has often been construed to cover animate property, as indicated by the examples set out in the note, and chattels of all kinds, personal, as well as real, especially portable chattels."

The term "property" according to Black's Law Dictionary " * * * is also commonly used to denote everything which is the subject of ownership * * *. It extends to every species of valuable right and interest, * * *."

Counsel have cited numerous cases tending to support their contentions. Perhaps those holding that the term "goods" does not cover animals are in the majority, but it is clear that the word "goods" can be and is given both interpretations.

While it is true that penal statutes must be strictly construed, this rule of law only comes into operation when the intention of Congress cannot be determined. Ladner v. United States, 1958, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed. 2d 199. Thus, when Congress leaves to the judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity. Bell v. United States, 1955, 349 U.S. 81, 75 S.Ct. 620, 99 L.Ed. 905. When the Congressional intention can be ascertained, then such intention controls even in penal statutes. United States v. Raynor, 1938, 302 U.S. 540, 58 S.Ct. 353, 82 L.Ed. 413, and Rainwater v. United States, 1958, 356 U.S. 590, 78 S.Ct. 946, 2 L.Ed.2d 996.

In the case of Ash Sheep Co. v. United States, 1920, 252 U.S. 159, 40 S.Ct. 241, 244, 64 L.Ed. 507, the controversy was whether sheep should be included within the term "cattle." The court held that they should be and stated:

"It is argued that the rule that penal statutes must be strictly construed forbids such latitude of construction. But this is sufficiently and satisfactorily answered by repeated decisions of this court. ·

" 'The admitted rule that penal statutes are to be strictly construed, is not violated by allowing their words to have full meaning, or even the more extended of two meanings, where such construction best harmonizes with the context, and most fully promotes the policy and objects of the legislature.' United States v. Hartwell, 6 Wall. 385 [18 L.Ed. 830]; United States v. Freeman, 3 How. 556, 565 [11 L.Ed. 724]; United States v. Lacher, 134 U.S. 624, 628 [10 S.Ct. 625, 33 L.Ed. 1080]."

For other cases citing this decision favorably or with similar rulings, see S. E. C. v. C. M. Joiner Corp., 1943, 320 U.S. 344, 64 S.Ct. 120, 88 L.Ed. 88; United States v. Corbett, 1909, 215 U.S. 233, 30 S.Ct. 81, 54 L.Ed. 173; and United States v. Brown, 1948, 333 U.S. 18, 68 S.Ct. 376, 92 L.Ed. 442.

· If the intent of Congress cannot be ascertained, then the rule of strict construction should be applied. A comprehensive search of the history of this statute reveals the following:

The statute originated as Senate Bill 2845 in the 73rd Congress in 1934. This was one of many bills, drawn by the Attorney General, known collectively as the

"antigangster bills." In transmitting these bills the Attorney General referred to the one in question as:

"2. A bill to extend the National Motor Vehicle Theft Act to cover *all property*, with certain limitations as to value." (Emphasis added.) Congressional Record—Senate, Vol. 78, Part 3, Pages 2946–2947.

Senator Ashurst, Chairman of the Senate Judiciary Committee which reported the bill, stated when the bill was being debated:

"Mr. Ashurst: Mr. President, among the so-called 'anti-gangster and antiracketeering bills' reported favorably from the Committee on the Judiciary is a bill to extend the provisions of the National Motor Vehicle Theft Act *to other stolen property.* * * * Gangsters who now convey *stolen property, except vehicles,* across the state line, thumb their noses at the officers." (Emphasis added.) Congressional Record, Vol. 78, Part 7, Page 6981.

The Senate Judiciary Report states that the purpose of the bill is to provide a penalty for transporting "stolen property in interstate commerce." Senate Report 538, page 1. Also:

"In the event that it is thought unwise to enlarge the scope of Federal jurisiction in such cases *to all property* of $1000 or more, I suggest that the minimum requirement be raised to $2500." (Emphasis added.) Senate Report 538, page 2, 73rd Congress.

(Note: The original bill set out a $1,000 limit. This was eventually changed to $5,000.)

The House Judiciary Report states:

"This bill is designed to punish interstate transportation of *stolen property,* securities or money." (Emphasis added.) House Report 1463, page 1, 73rd Congress.

It is also to be noted that the all-inclusive word "property" was frequently substituted for the words "goods, wares, merchandise" throughout the Congressional Record and in the Committee Reports. Nowhere was there found any indication in the Congressional Record that Congress intended to exclude animate objects although there were three separate Committee Reports and the bill was debated extensively in both Houses.

To be in keeping with the basic purposes of the other "antigangster bills," the statute must be given the broad interpretation. Their purpose was to prevent interstate crime. Prior to that time local authorities were left to deal with this type of crime. It was found that with the common use of the automobile and the truck, local authorities were not able to cope with it. It would seem contrary to the spirit and purpose of this comprehensive legislation to say that all thieves except horse thieves were covered by the bill.

Further explanation of the basic purposes of the "antigangster bills" is contained in a letter written by Attorney General Cummings to Senator Ashurst dated February 15, 1934. This letter is quoted in part above and is found in the Congressional Record—Senate, Vol. 78, Part 3, page 2,947.

The title and the enacting clause of Senate Bill 2845 read as follows:

"To extend the provisions of the National Motor Vehicle Theft Act *to other stolen property.*" (Emphasis added.) 48 Stat. 794.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, that this Act may be cited as the 'National *Stolen Property Act.*'" (Emphasis added.) 48 Stat. 794.

An argument has been made that there are no reported cases prosecuting for transporting animals under this statute. There may be several reasons for this. With the requirement of the value of $5,000, it would be most rare when any one transportation of animals would

come within that valuation. It would seem to require "show stock" or highly valued breeding animals.

It is clear that the Executive Department and the Attorney General who drew the bill advised Congress of the intent to cover all stolen property. In connection with a proposed amendment to the statute, the Attorney General wrote as follows:

"This Legislation proposes to amend the National Stolen Property Act, which in general makes it a criminal offense knowingly to transport in interstate or foreign commerce *any* stolen property of the value of $5000 or over." (Emphasis added.) Senate Report 674, 76th Congress.

Other examples of the Attorney General's interpretation are found in Congressional Record, Vol. 81, Part 8, page 9,000 (1937); House Report 1448, 75th Congress (1937); and Senate Report 1316, 75th Congress (1938).

In 1937, President Franklin D. Roosevelt, in vetoing Senate Bill 1375 which made it a crime to transport stolen animals in interstate commerce without any limitation as to value, stated:

"Cattle and poultry depredations on a large scale in instances, involving interstate transportation, can be prosecuted under the National Stolen Property Act if the value of the property is $5,000 or more." Congressional Record, Vol. 81.

This interpretation was repeated on other occasions prior to 1941.

Numerous attempts were made to enact legislation similar to Section 2314 prior to 1934. Attempts were made in 1928 (Senate Bill 1871, House Bill 7472, 69th Congress), 1929 (House Bill 10287, 70th Congress), and in 1930 (House Bill 119, 71st Congress). In all three bills very broad terms were used such as "any property or thing of value" or "any property of any character," so there was no doubt that animals were included within the scope of the proposed legisla-

tion. In addition to the broad terms used, there was also normally an enumeration of specific property such as "goods," "money," "securities," etc. From all indications in the legislative history of these bills, the legislation was not prepared by the Attorney General but was authored by other unknown persons.

When the Attorney General prepared the bill in question, he used the words "goods, wares, merchandise." This may not have been as specific as desired, but his letter of transmittal, the title of the bill, and the Congressional debates and reports indicate clearly that "goods" was used in the broadest sense and intended to cover animate objects.

It is urged that because of the enactment of Section 2316 of Title 18 in 1941, which section reads as follows:

"Whoever transports in interstate or foreign commerce any cattle, knowing the same to have been stolen, shall be fined not more than $5,000 * * *."

a Congressional understanding is evident that animate objects were not covered by Section 2314.

The Congressional history and debates indicate that particularly in the cattle country, Section 2314 was not effective as to animals because of the $5,000 valuation requirement. The Senators and Congressmen from this part of the country wanted all cattle covered regardless of value as shown by the many attempts to pass this type of legislation. It is true that in 1937 with reference to such proposed legislation, Mr. McLaughlin stated that the purpose of the bill was to cover livestock of under $5,000 in value and to resolve any question as to whether the transportation of stolen livestock in interstate commerce was a federal offense. Congressional Record, Vol. 81, Part 8, page 9,000.

It might be further pointed out in connection with Senate Bill 1375 in 1937 that Senate Report 1448 makes the statement that " * * * even if it be conceded that livestock comes within the

meaning of 'goods, wares, and merchandise' as used in the act referred to, the practical difficulty of proving a defendant guilty of transportation of a sufficient number of truckloads of stolen animals to make up a value of $5,000 renders the act a nullity insofar as this kind of crime is concerned."

The Attorney General on July 16, 1937, in writing to the Chairman of the Committee on the Judiciary in the House of Representatives with reference to Senate Bill 1375 to specifically cover cattle, stated:

"Cattle depredations on a large scale in instances involving interstate transportation can be prosecuted under existing law, as the National Stolen Property Act (act of May 22, 1934, 48 Stat. 794; U.S.C., title 18, secs. 413–419) penalizes the interstate transportation of stolen property of whatsoever kind of the value of $5,000 or more. The present act contains an element of flexibility, in that if a defendant is charged in the same indictment with two or more violations of the act, then the aggregate value of all the property referred to in the indictment constitutes the value for the purposes of prosecution. In other words, if the same person ships stolen goods on several occasions, Federal jurisdiction attaches if the aggregate value of all of the shipments equals $5,000 or more, even though the value of each shipment is less than this amount."

It is to be noted that these remarks were made in a different Congress than the one passing Section 2314. Construction of statutes is a matter for the courts rather than for subsequent Congresses. If subsequent Congresses do not concur in the construction of a statute by the courts, they have the right and duty to amend. Furthermore, these remarks merely expressed some misgivings by one Congressman.

The Committee uses the words "even if it be conceded that livestock comes within the meaning of 'goods, wares, and merchandise.'" This is far from any assertion that cattle do not come within that language as used in the statute, and particularly in view of the legislative history with reference to the passage of this act.

Defendants claim that the application of a penal statute must be determined from the statute itself and the language there used without reference to the legislative history. They cite Connally v. General Construction Co., 1926, 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322, on this contention. That decision involved a constitutional issue rather than construction of a statute.

In Rainwater v. United States, 1958, 356 U.S. 590, 78 S.Ct. 946, 949, 2 L.Ed. 2d 996, the court states:

"Yet even penal provisions must be 'given their fair meaning in accord with the evident intent of Congress.' United States v. Raynor, 302 U.S. 540, 552 [58 S.Ct. 353, 359, 82 L.Ed. 413]."

■ True, a penal statute must be construed in accord with its literal terms. Here, however, the word "goods" has more than one meaning. It is being construed literally whichever way it is applied, and the legislative history shows a Congressional intent to use it in the broad sense.

Defendants have quoted from United States v. Universal C. I. T. Credit Corp., 1952, 344 U.S. 218, 73 S.Ct. 227, 229, 97 L.Ed. 260. Prior to the quotation cited by the defendants, the court stated:

"The problem of construction of the criminal provisions of the Fair Labor Standards Act is not easy of solution. What Congress has made the allowable unit of prosecution—*the only issue before us*—cannot be answered merely *by a literal reading* of the penalizing sections. Generalities about statutory construction help us little. They are not rules of law but merely axioms of experience. Boston Sand & Gravel

, Co. v. United States, 278 U.S. 41, 48 [49 S.Ct. 52, 53, 73 L.Ed. 170]. They do not solve the special difficulties in construing a particular statute. The variables render every problem of statutory construction unique. See United States v. Jin Fuey Moy, 241 U.S. 394, 402 [36 S. Ct. 658, 659, 60 L.Ed. 1061]. For that reason we may utilize, in construing a statute not unambiguous, all the light relevantly shed upon the words and the clause and the statute that express the purpose of Congress. Very early Mr. Chief Justice Marshall told us, 'Where the mind labours to discover the design of the legislature, it seizes every thing from which aid can be derived * * *.' United States v. Fisher, 2 Cranch 358, 386 [2 L.Ed. 304]. Particularly is this so when we construe statutes defining conduct which entail stigma and penalties and prison. Not that penal statutes are not subject to the basic consideration that legislation like all other writings should be given, insofar as the language permits, a commonsensical meaning." (Emphasis added.)

Following the quotation cited by defendants and on page 222 of 344 U.S., on page 230 of 73 S.Ct. the following appears:

"Instead of balancing the various generalized axioms of experience in construing legislation, regard for the specific history of the legislative process that culminated in the Act now before us affords more solid ground for giving it appropriate meaning."

In the latest case involving this question, Ladner v. United States, 1958, 358 U.S. 169, 79 S.Ct. 209, 3 L.Ed.2d 199, in construing Section 254, 18 U.S.C. (1940 Edition) to determine whether one discharge of a shotgun injuring two federal officers was two offenses or one, the court points out that the legislative history is pertinent in construing a penal statute. In that particular instance the legislative history was of no help.

For the foregoing reasons, defendants' motions to dismiss the indictment are hereby denied.