**Decided October 16, 1986**

UNITED STATES DISTRICT COURT
FOR THE
NORTHERN MARIANA ISLANDS

APPELLATE DIVISION

MARIANAS PUBLIC LAND TRUST, ) DCA NO. 85-9006
 )
 Plaintiff-Appellant, )
 )
 vs. ) OPINION
 ) FILED
GOVERNMENT OF THE COMMONWEALTH ) Clerk
OF THE NORTHERN MARIANA ) District Court
ISLANDS and MARIANAS PUBLIC )
LAND CORPORATION, ) OCT 1 6 1986
 )
 Defendants-Appellees. ) For The Northern Mariana Islands
_____) By_____
 Deputy Clerk

 Attorney for Appellant: Theodore R. Mitchell
 P. O. Box 2020
 Saipan, CM 96950

 Attorneys for Appellees: Dorothy Sellers
 Pedro M. Atalig
 Juan T. Lizama
 P. O. Box 380
 Saipan, CM 96950

BEFORE: LAURETA, DUENAS and MARSHALL*, District Judges

LAURETA, District Judge:

## BACKGROUND

 Appellant Marianas Public Land Trust (MPLT) filed a complaint in the Commonwealth Trial Court on October 1, 1984, seeking declaratory and injunctive relief against the Commonwealth of the Northern Mariana Islands (CNMI).

_____

 *The Honorable Consuelo B. Marshall, United States District Judge, Central District of California, sitting by designation.

872

Specifically, appellant sought to have declared unconstitutional a transfer of funds from the Marianas Public Land Corporation (MPLC) to the CNMI General Fund. These funds were received from the United States government as the remaining payment under the Tinian Lease Agreement.

Appellant requested but was denied a preliminary injunction on October 10, 1984. The trial court filed a Memorandum Opinion the same day. The parties stipulated to entry of final judgment on March 14, 1985. Final judgment was entered on March 22, 1985, and appeal was made to this Court on April 22, 1985.

## STATEMENT OF FACTS

### a. The Evolution of the Tinian Lease Agreement

On February 15, 1975, the United States and the Northern Mariana Islands entered into a Covenant to Establish the Commonwealth of the Northern Mariana Islands (Covenant). Under §§802 and 803 of the Covenant, the Commonwealth agreed to lease to the United States 17,799 acres of land on Tinian, as well as other acreage not affected by this appeal. A rental price was agreed upon, subject to adjustment based upon the U.S. Department of Commerce Composite Index.

At the same time as the signing of the Covenant, the parties entered into a Technical Agreement to implement §§802 and 803. By the terms of the Agreement, the Commonwealth agreed to execute the proposed lease if the United States requested it to do so within five years of the effective date of §§802 and 803.

873

The U.S. made such a request and a lease pursuant to the Covenant was entered into on January 6, 1983. This lease affected only Tinian and was called the Tinian Lease Agreement. On that same day the parties executed a Land Acquisition and Deferred Payment Agreement.

The Tinian Lease Agreement provided total rent of $33 million. Payment was governed by the Land Acquisition Agreement. The first payment of $26,434,200 was made within ten days of execution of the Agreement and is not in dispute. The $6,565,800 balance was to be paid in three installments, one for each of three zones referred to in Article 3.b, Sections (2), (3), and (4) of the Land Acquisition Agreement. The zones were created in Article 1.b of the same agreement. Each zone contained land still privately held. Payment for the 3,950 acres within the zones was withheld by the United States because the Commonwealth had failed to acquire title to homestead parcels located in the zones.

The $6,565,800 was deposited in a joint account, with one time certificate of deposit for each zone. Deposit of the money by the United States was to "be considered by the parties to be full satisfaction" of the rental obligations of the United States. The Commonwealth could claim a certificate of deposit for a particular zone upon presenting clear title to all land within the zone.

The Land Acquisition Agreement was amended on July 5, 1984, to allow the $6,565,800 to be released immediately to the

Commonwealth. The only condition was that, within sixty days of receipt of the $6,565,800, the Commonwealth would, in fact, either acquire title to the homestead parcels or begin eminent domain proceedings. If the Commonwealth failed to undertake either step, "all unexpended funds... except funds deposited with the appropriate court for eminent domain proceedings, [would] immediately revert to the joint account... ."

### b. The CNMI Constitution

Article XI, §1 of the Constitution of the Commonwealth of the Northern Mariana Islands (Constitution) provides that ownership of public lands is held by people of the Commonwealth who are of Northern Marianas descent. Management of public lands is entrusted to a quasi-public agency, the Marianas Public Land Corporation (MPLC) by Article XI, §§4 and 5. Net revenue derived from management of public lands is to be held and invested by the Marianas Public Land Trust (MPLT), as set out in Article. XI, §6.

### c. The Romisher Decision

The problem in the instant case has its genesis in Romisher v. Marianas Public Land Corporation, et al., Commonwealth Trial Court Civil Action No. 83-401 (Nov. 25, 1983). There, plaintiff sought an injunction prohibiting MPLC from disbursing funds in its possession as compensation to private landowners on Tinian under the Tinian Lease Agreement. Two MPLC board members, who stood to reap direct financial benefit from

approval of the disbursement, were held by the court to be, as board members, fiduciaries under the CNMI Constitution to citizens of Northern Marianas descent.

Then, the trial court raised sua sponte the question of the propriety of MPLC disbursing any funds. The trial court acknowledged MPLC's constitutionally-defined role as manager, only, of public lands. Also, the trial court correctly noted that MPLC is not constitutionally empowered to acquire land. The court noted that only the CNMI Executive Branch, through normal procedures, can negotiate for acquisition of private interests, disburse funds, and acquire title. However, the court then, with no explanation, analysis, or justification approved the "escrow account" (joint account) established in §4(a) of the Land Acquisition Agreement and suggested that MPLC could act as "stakeholder" for the escrow account funds until the Executive Branch determined the value to be paid for the private interests. Then, MPLC could make the disbursement on behalf of the Executive Branch. The court opined that, should the "escrow" funds prove insufficient, alternatives for additional payment existed: A legislative appropriation or a call on MPLT for funds it was holding. No authority is given for this conclusion and it was not required for the decision.

///
///
///
///

Whether the $6,565,800 which was deposited in the joint account established by Article 4.a. of the Land Acquisition Agreement and paid, with interest, to the Commonwealth Government on July 10, 1984, is revenue derived from the lease of public lands, to which the Marianas Public Land Trust is entitled.

## DISCUSSION

### The Rent and the Joint Account

The issue facing the Court has grown from a fairly simple fact situation. Certain facts are undisputed:

1. The United States and the CNMI sought to, and did, enter into a long-term lease for land on Tinian.

2. The parties agreed upon a total rent of $33 million.

3. The CNMI failed to carry out its obligation under the lease to secure clear title to the private lands on Tinian which were inside the leased area.

4. A joint account was created. By depositing the remaining $6,565,800 in this account the United States fully satisfied its rent obligation under the lease.

5. The United States then agreed to amend the lease agreement to allow immediate release to the CNMI of all money in the joint account, prior to receiving clear title to the private lands.

Certain inferences fairly may be drawn from these facts:

AO 72
(Rev. 8/82)

877

1. The United States was frustrated with the unwillingness or inability of the CNMI to take the steps necessary to satisfy its lease obligation to secure clear title to the private lands on Tinian.

2. In an attempt to accelerate the process the United States released the money in the joint account and divorced itself from the proceedings to follow.

3. The CNMI government found it expedient to use a portion of the rent money to purchase the privately-held lands lying within the boundaries of the Tinian Lease Agreement and, accordingly, did so.

Appellant argues that the total rent was $33 million. Any amount less than that which MPLT receives means that full rent has not been paid. Since the United States and the CNMI agree that the full rent obligation has been satisfied by the United States, the joint account money must go to MPLT and cannot be used to acquire private land.

Appellee counters that the full rent is not due because the CNMI could not deliver good title as to the private lands. Because of this, the CNMI has not received the full payment to which it would otherwise be entitled.

Pragmatism appears to have triumphed over legality; a not uncommon phenomenon. Even appellee implicitly concedes this when it says "the Trust's claim is based on a wishful theory of what might have been, rather than on the actuality of the situation." However, appellee then exposes the flaw in its

878

position by posing and answering this question:

> What happens to the escrow account if the Commonwealth fails to acquire all private lands within the Tinian Lease Agreement? The answer is that the escrow account will revert to the United States because the United States has retained legal control over the account to protect itself from this very contingency.

Not quite. As noted above, in the amendment to the lease agreement the United States agreed to immediately release all the rent money being held in the joint account. The joint account money was part of the $33 million total rent which the United States paid in "full satisfaction" of its rent obligation. Once this rent was paid the CNMI Constitution required that it be turned over to MPLT. The joint account would have been legally acceptable under its initial formulation as a safe repository for the money until the CNMI acquired title to the private lands. However, the money to acquire the lands should have come from the CNMI government through normal processes.

The resolution to the problem which was worked out by the parties is perfectly logical if one ignores the threshold problem of its being unconstitutional.

When the problem of acquiring private lands arose, the CNMI took the path of least resistance and used a portion of the rent received from the United States to acquire the lands. The structuring of the joint account and the subsequent release of the money clearly shows the United States' tacit approval of this course of conduct. Seeking a pragmatic solution to the problems

72
.8/82.

caused by the inertia of the CNMI government led the parties to this witting or unwitting attempt to circumvent the CNMI Constitution.

### Landlord-Tenant, Restatement 2d, Property

The parties agree that, absent contrary statutory or decisional law, the Restatement 2d, Property (Restatement) applies in the CNMI by virtue of 7 Commonwealth Code §3401.

Appellee argues that under §4.2 of the Restatement the United States, as a tenant faced with a landlord unable to deliver possession of the entire premises, could abate the rent proportionally or seek damages resulting from its inability to use the premises. But, appellee instead says that the United States invented a third option: To re-channel a portion of what would have been rent into curing the CNMI's possession and title problems.

Appellant states that, taken together, §§802 and 803 of the Covenant and Part I.2 of the Technical Agreement are an option agreement to make a lease, within the meaning of Restatement §2.5. The subsequent Tinian Lease Agreement meets all formal requirements of a lease according to Restatement §2.2. However, when it came time to execute the lease the CNMI could not deliver full possession of the private lands and these lands constituted a legal interest in the leased premises according to Restatement §4.1(1). Because of this breach the United States could exercise its rights under §4.2, mentioned above.

The United States elected to withhold rent and place it in an escrow account as provided by §11.3 of the Restatement. However, the United States then completely abandoned its position and allowed the money to be released. This decision, which certainly was not required legally, clearly was payment of rent withheld. As such, the money should have gone directly to MPLT.

## Standard of Review

This Court has previously determined that the "clearly erroneous" standard applies to review of all factual determinations of the trial court. South Seas Corporation v. Sablan, 525 F.Supp. 1033, 1037 (D.N.M.I. 1981), aff'd 691 F.2d 508 (9th Cir. 1982). A finding of fact of the trial court is "clearly erroneous" when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. United States v. Oregon Medical State Society, 343 U.S. 326, 339, 72 S.Ct. 690, 698, 96 L.Ed. 978, 988 (1952); Dugan & Meyers Const. Co., Inc. v. Worthington Pump Corp. (USA), 746 F.2d 1166, 1172 (6th Cir. 1984).

In Pua v. Selepeo, Civ.App. No. 82-9001 (decided November 9, 1983), this Court considered the standard of appellate review of conclusions of law. After reiterating with approval its previous holding in South Seas with regard to factual findings, the Court went on to say that

> [I]t does not, however, follow that the conclusions of law contained in the trial

1/82)

881

court's decision are subject to the same clearly erroneous standard as that prescribed for reviewing findings of fact. Thus, where the facts in the record are not in significant dispute the task of the appellate court is to determine whether the legal conclusions are contrary to law. [Emphasis added]

Factual determinations must be "clearly erroneous" before they will be set aside. Review of legal conclusions must adhere to the "contrary to law" standard enunciated in Pua. Conclusions of law are freely reviewable by the appellate court. Official Creditors' Committee of Fox Markets, Inc. v. Ely, 337 F.2d 461, 467 (9th Cir. 1964), cert. denied, 380 U.S. 978, 85 S.Ct. 1342, 14 L.Ed.2d 272 (1965).

This Court is not bound by the trial court's determination under either standard.

### Stare Decisis And The Romisher Decision

Appellee argues that Romisher is important, whether decided rightly or wrongly, because non-parties could thereafter make decisions based upon it. Appellant notes this Court's duty to correctly state the law of the Commonwealth if it believes Romisher was decided incorrectly.

Stare decisis rests upon the principle that the laws by which we are governed should be fixed, definite, and known. In Re Proposal to Incorporate Town of Chesapeake, Kanawita County, 45 S.E.2d 113, 118, 130 W.Va 527 (1947). Generally, stare decisis effect is accorded to decisions of an equal or higher court. Mast, Foos, & Co. Inc. v. Stover Mfg. Co., 177 U.S. 485,

488-489, 44 L.Ed. 856, 858, 20 S.Ct. 708, 710 (1900). There is a well-recognized exception where the prior decision is clearly erroneous. Schott Optical Glass, Inc. v. United States, 750 F.2d 62, 64 (C.A.Fed. 1984). Stare decisis is applied with less force where matters involving interpretation of a constitution are concerned, because judicial error in construing a constitution cannot be corrected by the legislature and can be corrected only by the court. Smith v. Allwright, 321 U.S. 649, 665-666, 88 L.Ed. 987, 998, 64 S.Ct. 757, 765-766 (1944), reh. denied 322 U.S. 769, 88 L.Ed. 1594, 64 S.Ct. 1052 (1944). The stare decisis effect is weakened when only a single precedent is involved. United States v. Raynor, 302 U.S. 540, 551-552, 82 L.Ed. 413, 420, 58 S.Ct. 353 (1938), reh. denied 303 U.S. 665, 58 S.Ct. 520 (1938).

This Court is not bound by Romisher. Appellant MPLT was not a party to that case and made no appearance. However, a decision to disavow Romisher insofar as it relates to the issue in the instant matter will neither alter the resolution of the issue in Romisher (board members as fiduciaries) nor belatedly set aside that decision.

### The "Admission" Of Trial Counsel

Appellee argues that MPLT, through its attorney at trial, conceded appellee's right to use a portion of the "escrow" monies to acquire the private land on Tinian. Appellant replies that the trial court explicitly rejected this "admission" and

883

that, in any event, it would be manifestly unjust to give dispositive effect to an unauthorized statement of counsel which was so at variance with appellant's complaint.

 An admission such as this is called a "judicial admission." A judicial admission is a formal act done in court, which dispenses with proof of a fact claimed to be true, and is used as a substitute for legal evidence at the trial. Giamanco v. Giamanco, 444 NE2d 1090, 1093 (Ill.App. 1982). An admission by an attorney, to be binding upon a client, must be distinct and formal and made for the express purpose of dispensing with formal proof of some fact at trial. Hogenson v. Service Armament Co., 461 P.2d 311, 314 (Wash. 1969). Whether a statement of an attorney should be considered a judicial admission depends to a great extent on whether the statement is made within the scope of his or her authority. Taylor v. Allis-Chalmers Mfg. Co., 320 F.Supp. 1381, 1385 (1969), aff'd 436 F.2d 416 (1970). A judicial admission must be unequivocal to be binding. Glick v. White Motor Co., 458 F.2d 1287, 1291 (1972).

 There was not the requisite intent and formality to properly charge appellant's trial attorney with having made a judicial admission regarding the use of a portion of the escrow money to acquire private Tinian lands.

///
///
///
///

884

## Lack Of A Justiciable Controversy

Appellee argues finally that, even should this Court agree that the "escrow" money is rent, the case should be dismissed for lack of a presently justiciable case or controversy. This is because there are currently pending appeals from a handful of private landowners on Tinian, who argue that fee interest should not be condemned, since the lease is to be only 50 or 100 years long. Appellee argues that the decision in these cases may mean the Commonwealth will never be able to provide evidence of fee title to the United States. As a result, the Tinian lease as to these lands cannot become effective.

This is a curious argument to make, particularly for the first time on appeal. However, by the Amendment to the Land Acquisition Agreement the United States chose to accept the risk, however small, that the Commonwealth might never be able to deliver fee title to these lands. The problem arises because the Amendment appears to be internally inconsistent.

In §2 of the Amendment, the United States immediately releases to the CNMI all money in the joint account. Later, in §4, it is stated that the "unexpended funds" will revert to the joint account if the Commonwealth fails to provide acceptable title or commence eminent domain actions within sixty days of the date of the Amendment. When the money was released, it was released with only the two conditions mentioned above. No method was provided to recover the money and, indeed, it is difficult to believe the United States seriously contemplated the prospect of

885

retrieving the money, should the need arise.

The United States chose to release the money. It appears that the Commonwealth, finally, did all it was required to do: It acquired the land or began condemnation proceedings. The United States must deal with the consequences of its earlier decision to release the money.

By the terms of the CNMI Constitution the money in the escrow account, which had until establishment of this account always been referred to as rent, should have gone directly to appellant MPLT when it was released.

## CONCLUSION

The money in the joint account was rent. When the money was released it should have gone to MPLT as income derived from public lands. Money to acquire privately-held lands on Tinian should have come from the CNMI government through normal procedures.

The decision of the trial court is reversed and remanded with instructions that appellee be ordered to immediately pay to appellant the sum of $6,565,800.00, plus accured interest.

JUDGE ALFRED LAURETA

JUDGE CONSUELO B. MARSHALL

JUDGE CRISTOBAL C. DUENAS

886